595 A.2d 469

# LLOYD E. MITCHELL, INC.

### v.

# MARYLAND CASUALTY COMPANY.

**No. 136, Sept. Term, 1990.**

Court of Appeals of Maryland.

Sept. 12, 1991.

Jay I. Morstein (Frank, Bernstein, Conaway & Goldman, both on brief), Baltimore, for petitioner.

Joseph D. Tydings, Anderson, Kill, Olick & Oshinsky of Washington, D.C., Emory Plitt, Harford Co. Atty., Jefferson L. Blomquist, Asst. Co. Atty., Bel Air, Gorman E. Getty, Allegany Co. Atty. Cumberland, Stephen Beard, Anne Arundel Co. Atty., Stephen M. LeGendre, Deputy Co. Atty., Annapolis, Arnold Jablon, Baltimore Co. Atty., Towson, William R. Bailey, Calvert Co. Atty., Prince, Frederick, amicus curiae for all Fifteen Maryland Counties.

Jordan S. Stanzler, Anderson, Kill, Olick & Oshinsky P.C., New York City, Mark Kolman, Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Baltimore, amicus curiae for Bausch & Lomb Inc.

E. Charles Dann, Jr. (Thomas M. Trezise, Stephen E. Marshall, Semmes, Bowen & Semmes, all on brief), Towson, for respondent.

John B. Wyss, Joseph L. Ruby, Wiley, Rein & Fielding Washington, D.C., M. King Hill, Venable, Baetjer & Howard, Towson, amicus curiae for Utica Mut. Ins. Co.

Argued before MURPHY, C.J., ELDRIDGE, McAULIFFE, CHASANOW, and KARWACKI, JJ., and J. WILLIAM Hinkel, Administrative Judge of the Third Judicial Circuit of Maryland, Specially Assigned.

MURPHY, Chief Judge.

This case focuses upon the event or events which trigger insurance coverage under a standard form comprehensive general liability insurance policy in the context of asbestos-related personal injuries.

### I.

For a number of years, Lloyd E. Mitchell, Inc. (Mitchell), a mechanical contractor, was involved in the sale, distribution, and installation of products which contained asbestos. It ceased all business operations in 1976, but maintains a valid corporate charter.

From 1955 through January 1, 1977 or January 1, 1978,[1] Mitchell was insured by the Maryland Casualty Company (the insurer) under a series of standard form comprehensive general liability policies.[2] The policies required that the insurer pay on behalf of the insured

"all sums which the insured shall become legally obliged to pay as damages because of ... bodily injury ...

---

**1.** The parties disagree about the year that the last policy expired. The insurer contends that the policy expired on January 1, 1977, while Mitchell contends that the final expiration date was January 1, 1978.

**2.** The terms of the insurance contract between Mitchell and Maryland Casualty are not unique to this case. The comprehensive general liability policy is a policy standardized by the insurance industry. *See* 2 R. Long, *The Law of Liability Insurance,* § 11.01 (1979); Comment, *Insurance Coverage of Asbestosis Claims—Running for Cover or Coverage,* 32 Emory L.J. 901, 904 (1983); Comment, *Liability Insurance for Insidious Disease: Who Picks Up the Tab?,* 48 Fordham L.Rev. 656, 666–67, n. 50 (1980).

caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury ... even if any of the allegations of the suit are groundless, false or fraudulent."

The policies contained the following definitions:

"1. Occurrence: means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

"2. Bodily Injury: means bodily injury, sickness, or disease sustained by any person which occurs during the policy period including death at any time resulting therefrom."

Subsequent to the expiration of its last policy, Mitchell was sued by a number of plaintiffs who sought personal injury damages allegedly arising from exposure to and consequent injury from Mitchell's asbestos products. Mitchell demanded that the insurer provide a defense to the law suits; the insurer declined on the ground that the claims were not within the coverage of the policies. Thereafter, on December 27, 1988, the insurer filed a complaint for declaratory judgment in the Circuit Court for Harford County. It sought a declaration that it had no obligation to defend Mitchell against any of the claims asserted in the pending suits.

Mitchell filed a counter complaint for declaratory judgment on January 6, 1989; it sought a declaration that the insurer was required to "provide a defense to and indemnify Mitchell against (consistent with policy limits) all personal injury asbestos related suits wherein the plaintiffs allegedly may have been exposed, during the policy period, to an asbestos product allegedly applied or supplied by Mitchell, regardless of when the alleged asbestos related disease manifested itself." The counter complaint also sought a declaration that the insurer was obligated to pay Mitchell's attorney fees, costs, and expenses incurred in litigating the

coverage issue; in defending against the asbestos-related personal injury claims; and, further, to pay the amount of any judgments rendered against it or any settlements entered into in connection with the asbestos-related claims.

On October 26, 1989, the insurer moved for summary judgment, contending that the series of comprehensive general liability policies issued to Mitchell between January 1, 1967 and January 1, 1977 "provide coverage for bodily injuries caused by an occurrence" and that an "occurrence" under an insurance policy is the date when the harm is first discovered. The insurer stated that because all of the alleged bodily injuries which gave rise to the suits against Mitchell were discovered subsequent to the termination of its policies, it was not under a duty to defend or indemnify Mitchell.

On November 1, 1989, Mitchell moved for partial summary judgment on the trigger of coverage issue, claiming that there was no material dispute of fact and that it was entitled to judgment as a matter of law. Mitchell's motion recited that the insurer was obligated to defend and indemnify it in connection with any claims for asbestos related personal injuries "where the claimants allegedly were exposed to allegedly asbestos containing products supplied by Mitchell, wherein the exposure or exposures occurred during any of the policy periods in which said insurance policies were in effect." In support of the motion, Mitchell asserted that the terms of the policy required the insurer to defend and indemnify it in cases where the plaintiffs allege or potentially can allege that they were exposed during the policy periods to its asbestos products, even though their alleged injuries did not manifest themselves until some period after the last insurance policy lapsed. Mitchell stated that resolution of this question required consideration of medical evidence associated with exposure to asbestos products and the manifestation of asbestos related diseases. In this connection, Mitchell appended to its motion the affidavit of Dr. John E. Craighead, a physician and pathologist.

Dr. Craighead's affidavit described the development of the diseases of asbestosis, bronchogenic carcinoma, and mesothelioma. He said that asbestosis, a scarring disease of the lungs, results consequent to injury to lung tissue, which occurs when asbestos fibers accumulate in the small branches of the respiratory tree; that mesothelioma, a rare tumor, appears to result from the deposition of asbestos fibers in the external lining surface of the lungs; that bronchogenic carcinoma is almost exclusively linked to cigarette smoking; that exposure to asbestos acts as a promoter of cancer development by changing the susceptibility of the respiratory mucosa to the carcinogenic substances in cigarette smoke; that each asbestos fiber has the capacity to elicit an inflammatory response within minutes of inhalation, subsides over the ensuing few days, and is followed by a healing phase, after which the process is quiescent unless exposure to additional asbestos fibers occurs; and that if the inflammation leads to scarring of the lung as a result of repeated exposure to asbestos, then the scar tissue will remain throughout the life of the individual. Dr. Craighead's affidavit is included as Appendix A to this opinion.

On November 7, 1989, the insurer opposed Mitchell's summary judgment motion. It claimed that there was a dispute of material fact in that medical evidence would show that asbestos, by itself, does not create a "bodily injury," as required by the terms of the policy. Appended to its opposition motion was the affidavit of Dr. Paul Epstein, a clinician, which stated that asbestosis is a disease that occurs in lung tissue as a result of exposure to asbestos; that a series of events occurs before asbestosis develops in an individual; that an entire sequence of fiber deposition, clearance, envelopment, sequestration, detoxification, inflammatory response, and counterbalancing anti-inflammation is part of the lung's normal response to inhalation of foreign fibrous or particulate material; that it is only after a period of two decades or more when some individuals who were exposed to asbestos appear to lose the effectiveness of the counterbalancing anti-inflammation

that asbestosis may develop; that the stages which precede the development of widespread pulmonary fibrosis do not constitute disease; and that any or all of these earlier stages may occur without ever progressing to widespread pulmonary fibrosis and, therefore, without ever resulting in disease. Dr. Epstein's affidavit is included as Appendix B to this opinion.

The trial court (Carr, J.), after reviewing the pleadings, interrogatories, admissions, and affidavits filed in the case, concluded that no issues of material fact were in dispute relative to the proper interpretation of the policies. It granted the insurer's motion for summary judgment and denied Mitchell's partial summary judgment motion. In declaring the rights of the parties, the court said that the first issue pertained to the insurer's duty to defend Mitchell and the second concerned its duty "to indemnify in a delayed manifestation case." Relying primarily on *Harford Mut. Ins. v. Jacobson*, 73 Md.App. 670, 536 A.2d 120 (1988) and *Mraz v. Canadian Universal Insurance Co., Ltd.*, 804 F.2d 1325 (4th Cir.1986), the court concluded that "occurrence," in the context of insurance coverage, is defined as the date when the harm is first discovered. Because the alleged asbestos-related diseases did not manifest themselves until after the lapse of the insurance policies, it determined that the complaints filed against Mitchell were not within the coverage of the policies, and, thus, the insurer was under no obligation to defend or indemnify Mitchell.

We granted Mitchell's petition for a writ of certiorari prior to consideration of its appeal by the intermediate appellate court. The issues submitted for review in Mitchell's petition were (1) whether "coverage under a comprehensive general liability insurance policy [was] triggered, in the context of asbestos-related personal injury claims against the insured, when the injured party was exposed to asbestos, and/or when the asbestos disease progressed during periods of non-exposure, and/or when the asbestos disease first manifested itself to a clinically detectable

degree" and (2) whether the trial court erred "in adopting the 'manifestation' theory of insurance coverage, when the medical evidence demonstrates that, pathologically, damage occurs to the human body upon the exposure to and inhalation of asbestos fibers, even though the asbestos-related disease may not manifest itself to a clinically detectable level until many years thereafter."

In a cross-petition for certiorari, the insurer presented, as the issue, whether "the Circuit Court properly interpreted Maryland law by asserting that the bodily injury necessary to establish an occurrence for purposes of determining coverage under a general liability insurance policy arises upon manifestation of the bodily injury."

## II.

The parties renew and expand upon their arguments before the trial court. Neither argues that the pertinent policy language is ambiguous; rather, each maintains that the common and ordinary meaning of the policy language supports its position as to the event or events which trigger coverage under the policy.

Mitchell urges that the trial court was in error in holding that coverage under its standard form comprehensive general liability insurance policy is triggered only when the injury is actually manifested. Mitchell asserts that, at a minimum, the plain language of the policy supports the conclusion that exposure to the insured's asbestos products during the policy period triggers coverage. In this regard, Mitchell claims that, with one exception, all courts which have decided the issue in the context of asbestos-related personal injuries have reached this result.[3] Mitchell contends that exposure to asbestos products during the policy period constitutes an "occurrence" which results in "bodily injury" within the meaning of the policies, without regard

---

**3.** The single exception is alleged to be *Eagle–Picher Industries, Inc. v. Liberty Mut. Ins.,* 682 F.2d 12 (1st Cir.1982), *cert. denied,* 460 U.S. 1028, 103 S.Ct. 1279, 75 L.Ed.2d 500 (1983).

to whether the injury is diagnosable or compensable at that time. Mitchell asserts that Dr. Craighead, as a pathologist, defines an "injury" to be the alteration of structure and/or function of a cell, tissue or organ and would include physical or chemical damage to the body which may be detectable only on a microscopic or subclinical level. According to Mitchell, Dr. Craighead's affidavit describes the mechanisms whereby various asbestos-related injuries and diseases are known to develop from exposure to and inhalation of asbestos fibers. Mitchell asserts that Dr. Craighead's affidavit establishes how the asbestos-related diseases of asbestosis, bronchogenic carcinoma, and mesothelioma start with injuries to cells, tissues, and/or organs caused by exposure to and inhalation of asbestos fibers, notwithstanding that the injuries and diseases may not be noticeable to a harmed individual or diagnosable by a clinician until some later point in time. In its brief, Mitchell contends that the substance of Dr. Craighead's medical opinion demonstrates that

"inhaled fibers which are not exhaled may enter one of several million air sacs in the lungs, provoking an irritation and inflammatory response by body cells known as alveolar macrophages and leukocytes. The result of the bodily process which attempts to protect against the foreign object, namely the asbestos fiber, is that there are injuries to the cells, tissues and bodily organs which occur within minutes after the inhalation of the asbestos fibers. This process continues with each additional exposure to and inhalation of asbestos fibers, with each additional exposure resulting in new and additional injuries to cells, tissues and organs.

"Despite the relatively immediate injury to the cells, tissues and organs of the body, there are significant latency periods (15 and more years) before conditions such as asbestosis, bronchogenic carcinoma, and mesothelioma manifest themselves and become diagnosable to a clinician. However, as described by Dr. Craighead, the exposure to asbestos fibers and the inflammatory re-

sponse of the body to those fibers constitute subclinical injuries and disease processes which would be detectable by a pathologist if he could examine the bodily tissue prior to the manifestation of the asbestos related disease."

Mitchell claims that there is no conflict between Dr. Craighead's affidavit and that of Dr. Epstein. It notes, however, that Dr. Epstein's affidavit related solely to the disease of asbestosis which, in his view, did not become a disease until there is a manifested functional impairment to the activity of the lung. Mitchell points out that Dr. Epstein's affidavit did not discuss how the inhalation of asbestos fibers can lead to bronchogenic carcinoma and mesothelioma, nor does he refute Dr. Craighead's evidence that exposure to asbestos can cause injury to a person's cells, tissues, and/or organs before an asbestos-related disease becomes noticeable to the harmed person or is diagnosable by a clinician.

Maryland Casualty maintains that the trial court correctly applied the "manifestation" trigger of coverage because the alleged bodily injuries for which damages are sought did not manifest themselves until after the expiration of the policies. The insurer claims that the affidavits from the two physicians are "virtually identical"; it emphasizes, however, that Dr. Craighead is a pathologist while Dr. Epstein is a clinician. Based on these affidavits, the insurer in its brief advances this summary of the medical evidence contained in the affidavits:

"For asbestos-related diseases to develop, a series of events must occur, although those events may not occur for decades. First, asbestos fibers of a respirable size must be inhaled. Most of the inhaled fibers will never reach the respiratory tract as they will be trapped in the upper airway by a combination of the turbulent flow of air in the nose and throat and the sticky mucous lining of the upper airway structures. Smaller fibers may evade this defense mechanism and enter the lower respiratory tract, which consists of a series of progressive branching

and narrowing bronchial tubes. If a fiber ever reaches the bronchial walls the natural defense mechanisms in the lungs initiate a series of actions that effectively remove the fibers from the lung. Should a fiber evade the removal system, the fiber will be coated with a proteinaceous material that sequesters and detoxifies the fiber. During this process the human body may also secrete another substance that may damage the alveolar walls of the lung. This inflammatory process, however, is counterbalanced by a number of anti-inflammatory and protective chemical substances that are released by the cells of the lung. This entire sequence of fiber deposition, clearance, envelopment, sequestration, detoxification, inflammatory response and counterbalancing anti-inflammation is all part of the normal response of the lung to inhalation of foreign fibrous or particulate material. It is only after a period of two decades or more of exposure to asbestos that individuals appear to lose the effectiveness of the counterbalancing anti-inflammation that asbestosis may eventually develop. Moreover, any or all of these earlier stages may occur without ever progressing to widespread pulmonary fibrosis and, therefore, without ever producing disease."

The insurer emphasizes that the policies define an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." From this foundation, the insurer observes that the policy defines "Bodily Injury" to mean "bodily injury, sickness or disease sustained by any person which occurs during the policy period." According to the insurer, for there to be coverage under the policy, the claimant must not only sustain a bodily injury or disease, but the injury or disease must occur during the policy period. The insurer argues that the common and plain meaning of the policy language supports this conclusion; that a reasonable person would expect that insurance coverage would be triggered only when a claimant manifests

symptoms of disease during the policy period; and that the term "bodily injury" in the policy, given its ordinary meaning, does not include microscopic subclinical alterations which produce no functional impairment. The insurer claims that the exposure theory of coverage is contrary to the plain terms of the policy as it is based on the wrongful act, and not the resulting injury, as the event that triggers coverage without regard to whether any bodily injury actually occurred at that time. The insurer goes on to state that unless words are to be deprived of all meaning,

"a person does not have a 'disease' and does not suffer a 'bodily injury' if he does not feel bad, has no physical discomfort, has no complaints, his work and pleasure activities are not affected, his energy is not impaired, his general lifestyle is not adversely affected, and he has no indication whatsoever that any change has occurred to his bodily tissues."

For these reasons, the insurer maintains that the trial court was correct in its reliance upon the Maryland law espoused in *Harford Mut. Ins. v. Jacobson,* 73 Md.App. 670, 536 A.2d 120 (1988). That case, which involved a claim for personal injury resulting from lead poisoning, addressed the question of "what event gives rise to an occurrence within the meaning of [the standard form general liability insurance] policy when there is repeated or continuous exposure to a condition." 73 Md.App. at 681, 536 A.2d 120. The court there applied what it termed the "general rule" that the " 'time of occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged,' " quoting from *United States Fidelity & Guaranty Co. v. American Ins. Co.,* 169 Ind.App. 1, 345 N.E.2d 267, 270 (1976). The intermediate appellate court said that courts have consistently held that the party was "damaged" when the injuries first manifested themselves. *Id.* That same holding, the insurer contends, is contained in *Mraz v. Canadian Universal Ins. Co., Ltd.,* 804 F.2d 1325 (4th Cir.1986), a case involving property damage occurring

from the leakage of buried hazardous waste. There, the court said:

> "There are situations, however, in which the existence or scope of damage remains concealed or uncertain for a period of time even though damage is occurring. The leakage of hazardous wastes as in this case is a clear example. Determining exactly when damage begins can be difficult, if not impossible. In such cases we believe that the better rule is that the occurrence is deemed to take place when the injuries first manifest themselves." *Id.* at 1328.

Consistent with the holdings in *Jacobson* and *Mraz*, the insurer opines that because the connection between exposure to asbestos and the subclinical changes is extremely tenuous, it is incorrect to say that exposure to asbestos results in any type of injury, including subclinical alterations. As to this, the insurer emphasizes that the policy focuses on the date of the injury, and not upon the precipitating event, as the coverage trigger date.

### III.

In a declaratory judgment action which presents an issue of coverage under the terms of an insurance policy, "it is the function of the court to interpret the policy and decide whether or not there is coverage." *St. Paul Fire & Mar. Ins. v. Pryseski*, 292 Md. 187, 194, 438 A.2d 282 (1981). The primary principle of construction of insurance policies is to apply the terms of the contract. *Mut. Fire, Marine & Inland Ins. v. Vollmer*, 306 Md. 243, 250, 508 A.2d 130 (1986). *Pacific Indem. v. Interstate Fire & Cas.*, 302 Md. 383, 388, 488 A.2d 486 (1985). Unless there is an indication that the parties intended to use words in the policy in a technical sense, they must be accorded their customary, ordinary, and accepted meaning. *Cheney v. Bell National Life*, 315 Md. 761, 766, 556 A.2d 1135 (1989); *Howell v. Harleysville Mut. Ins. Co.*, 305 Md. 435, 443, 505 A.2d 109 (1986); *Pacific Indem., supra*, 302 Md. at 388–89, 488 A.2d

486; *DeJarnette v. Federal Kemper Ins. Co.*, 299 Md. 708, 721, 475 A.2d 454 (1984).

With these principles in mind, it bears repeating that the standard form comprehensive general liability insurance policies here involved require Maryland Casualty to pay on behalf of the insured "all sums which the insured shall become legally obliged to pay as damages because of ... bodily injury ... caused by an occurrence." The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury ... neither expected nor intended from the standpoint of the insured." It is thus clear from these provisions that coverage turns on the happening of an "occurrence" during the policy period, which results in "Bodily Injury," a term defined in the policy in the disjunctive as (1) bodily injury, or (2) sickness, or (3) disease.

The intermediate appellate court in *Zurich Ins. v. Northbrook Excess & Surplus*, 145 Ill.App.3d 175, 98 Ill.Dec. 512, 494 N.E.2d 634 (1986), considered these policy provisions in a declaratory judgment action involving claims for personal injuries alleged to have been sustained by exposure to asbestos products. The court said that "each of the three terms [bodily injury, sickness, and disease] is separate and distinct, as evidenced by the use of the disjunctive 'or' and must be considered separately as a trigger of coverage." 98 Ill.Dec. 512, 494 N.E.2d at 642. In considering whether coverage is triggered by exposure, the court consulted Webster's Third New International Dictionary, at 245 and 1164 (1981), to ascertain the meaning of the term "bodily injury." It determined that the word "injury" is thereby defined as harm or damage, and that the adjective "bodily," which modifies injury, is defined as "of, or relating to the body." Taken together, the court concluded that "the plain meaning of the term 'bodily injury' is harm or damage of, or relating to the body." *Id.* at 98 Ill.Dec. 512, 494 N.E.2d at 642. The Supreme Court of Illinois, on appeal, adopted these views. *See Zurich Ins. Co. v. Raymark Industries*, 118 Ill.2d 23, 112 Ill.Dec. 684, 693, 514 N.E.2d 150, 159

(1987). In like vein, the court in *Ins. Co. of No. Am. v. Forty-eight Insulations*, 451 F.Supp. 1230, 1242 (D.C., E.D.Mich., S.D.1978), *aff'd*, 633 F.2d 1212 (6th Cir.1980), a declaratory judgment action involving the interpretation of the standard form comprehensive general liability insurance policy in an asbestos case, said that "[w]hile the definition of bodily injury *includes* sickness or disease ... the definition also specifically includes injury to the body within its terms." (Emphasis in original.) In affirming the district court, the United States Court of Appeals for the Sixth Circuit said that "for insurance purposes, courts have long defined the term 'bodily injury' [to mean] any localized abnormal condition of the living body," 633 F.2d at 1222, citing Appleman, *Insurance Law and Practices*, § 355 (1965). *See also* Black's Law Dictionary 159 (5th ed.1979), which states that "bodily injury ... [g]enerally refers only to injury to the body or to sickness or disease contracted by the injured as a result of injury."

## IV.

The trial court's determination that the policy now before us provides coverage *only* after an asbestos-related disease becomes manifest during the policy period is an interpretation at odds with the policy language and the clear weight of authority in the country. In considering the meaning of "bodily injury" alleged to have resulted from exposure to asbestos, a number of courts, after considering evidence with respect to the development of asbestos-related diseases, have concluded that "bodily injury" occurs when asbestos is inhaled into the lung, and that, *at a minimum,* coverage under the policy is triggered by exposure to the insured's asbestos products during the policy period. *See e.g., Abex Corp. v. Maryland Casualty Co.*, 790 F.2d 119, 126 (D.C.Cir.1986); *Commercial Union Ins. Co. v. Sepco Corp.*, 765 F.2d 1543 (11th Cir.1985); *AC And S, Inc. v. Aetna Cas. and Sur. Co.*, 764 F.2d 968 (3d Cir.1985); *American Home Products Corp. v. Liberty Mut. Ins.*, 748 F.2d 760, 764 (2d Cir.1984); *Keene Corp. v. Ins. Co. of*

*North America,* 667 F.2d 1034 (D.C.Cir.1981) *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982); *Porter v. American Optical Corp.,* 641 F.2d 1128 (5th Cir.1981), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Ins. Co. of North America v. Forty–Eight Insulations,* 633 F.2d 1212 (6th Cir.1980), *clarified,* 657 F.2d 814, *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Lac D'Amiante Du Quebec v. Am. Home Assur.,* 613 F.Supp. 1549 (D.N.J.1985); *Owens–Illinois, Inc. v. Aetna Cas. & Sur. Co.,* 597 F.Supp. 1515 (D.D.C.1984); *Zurich Ins. Co. v. Raymark Industries,* 118 Ill.2d 23, 112 Ill.Dec. 684, 514 N.E.2d 150 (1987). These cases have based their determination on scientific or medical evidence that exposure to, and inhalation of asbestos fibers results in "bodily injury" within the contemplation of the policy, even though the injury may not manifest itself until many years later.

*Zurich Ins. Co., supra,* decided by the Supreme Court of Illinois, is illustrative of the reasoning behind the adoption of the exposure theory of coverage in asbestos cases. That case was a declaratory judgment action brought by the insurer to determine its obligations under the standard form liability policy to defend and indemnify its insured in thousands of cases alleging personal injuries (asbestosis, bronchogenic carcinoma, and mesothelioma) resulting from exposure to asbestos-containing products. The court heard extensive expert medical testimony from nine physicians; some were clinicians and others were pathologists. It noted that while the clinicians and pathologists generally agreed regarding the pathogenesis of asbestos-related diseases, they disagreed as to the point in time when injury resulted to the body. After reviewing the medical evidence, the court observed that the clinicians, in their testimony, focused upon an individual's susceptibility to disease; their testimony was that even if the inhalation of asbestos fibers caused microscopic injury to the cells of the lung, the lung has the capacity to repair localized damage and to reverse fibrosis. The clinician witnesses said that asbestosis begins to develop only after the lungs' defense mechanisms are

overcome; but because the effectiveness of every person's defense mechanisms varied, depending upon various factors—including the duration and intensity of exposure—it was not possible to determine exactly when a disease begins and, consequently, it could not be said that it began when asbestos fibers were first inhaled. Thus, according to the clinician witnesses, a disease does not occur until it is capable of being diagnosed, and in the absence of symptoms, a disease cannot be diagnosed with any degree of medical certainty. 112 Ill.Dec. at 690, 514 N.E.2d at 156.

Notwithstanding this testimony, the court in *Zurich,* in determining what event triggered coverage, found that the unambiguous language of the policy provided that "bodily injury" due to an "occurrence" is the event which gives rise to the insurer's obligation to extend coverage. 112 Ill.Dec. at 693, 514 N.E.2d at 159. Based on the medical evidence before it, the court concluded that, once inhaled, "asbestos fibers cause physical and biochemical injuries to the cells of the lung at or shortly after inhalation" and that occurrence constitutes a "bodily injury" within the contemplation of the policy. *Id.* 112 Ill.Dec. at 693–94, 514 N.E.2d at 159–160. The court further explained that the medical evidence was adduced, not to assist it in defining the terms "bodily injury, sickness or disease," but rather to assist it in determining when those events took place. *Id.* 112 Ill.Dec. at 694, 514 N.E.2d at 160. The court declared that the evidence in the record amply supported the trial court's finding that bodily injury occurs "when asbestos fibers are inhaled and retained in the lung," and consequently an insurer whose policy was in force at the time a claimant was exposed to asbestos must provide coverage of that claim. *Id.*

*Zurich,* and the numerous cases that support its conclusion, thus recognizes that "bodily injury" must result during the policy period, *albeit* nothing in the policy language expressly requires that the injury be diagnosed or identified within that period, or that the injury manifest itself or progress to sickness or disease during the policy period.

*See, e.g., Abex, supra,* 790 F.2d at 127; *American Home Products Corp. v. Liberty Mut. Ins.,* 748 F.2d 760, 764 (2nd Cir.1984) (an injury which existed during the policy period was sufficient to establish coverage under the policy regardless of when the injury was discovered). Of course, it is implicit that *mere* exposure to asbestos, without injury, does not trigger coverage. *Abex, supra,* 790 F.2d at 127. In this vein, however, the cases recognize from the medical evidence that inhalation of asbestos fibers starts the injurious chain of events which may culminate in an asbestos-related disease. *See, e.g., Keene Corp., supra,* 667 F.2d at 1047 ("bodily injury" in asbestos coverage cases is any part of the single injurious process that asbestos-related diseases entail); *Commercial Union Ins. Co., supra,* 765 F.2d at 1546 (exposure theory of coverage does not posit that each inhalation of asbestos fibers results in bodily injury but that "every asbestos-related injury results from inhalation of asbestos fibers"); *Forty-eight Insulations, supra,* 633 F.2d at 1218, 1222 ("bodily injury" is any localized abnormal condition of the living body; excessive inhalation of asbestos causes tissue damage to the lung, which occurs shortly after initial inhalation); *Lac, supra,* 613 F.Supp. at 1558 ("bodily injury" includes any pathological changes to the human organism, including internal, non-observable tissue damage, and encompasses subclinical insult to lung tissue which can result shortly after inhalation).

Although Dr. Craighead as a pathologist and Dr. Epstein as a clinician viewed asbestos-related diseases from different perspectives, there was no disagreement that the inhalation and retention of asbestos fibers may cause immediate harm to the cells and tissues of the lung. For purposes of this declaratory judgment action, we do no more than apply the policy provisions and decide whether, in light of the medical evidence, the insurer has a duty to defend Mitchell and to indemnify it for those amounts, consistent with policy limits, that Mitchell may be legally obligated to pay as damages in connection with the asbestos-related claims

against it.[4]

Considering the plain meaning of the term "bodily injury," as used in the policy, and in light of the medical evidence concerning the development of asbestos-related diseases, we align ourselves with the overwhelming weight of authority in the country and conclude that "bodily injury" occurs when asbestos is inhaled and retained in the lungs. In this regard, for purposes of policy coverage, it is not important that Dr. Craighead and Dr. Epstein may disagree as to the time when the changes in the lungs may be classified as a disease. On the record developed in this case, we conclude that, at a minimum, coverage under the policy to provide a defense and indemnification of the insured is triggered upon exposure to the insured's asbestos products during the policy period by a person who suffers bodily injury as a result of that exposure. Accordingly, we hold that the trial judge erred in adopting, as the *sole* trigger of coverage, the "manifestation" theory of coverage, namely, that coverage is not afforded until harm actually becomes manifest. The trial court's reliance upon the *Harford Mut. Ins.* and *Mraz* cases (both *supra*) does not support its rejection of the exposure theory of coverage for asbestos-related injuries. Neither of those cases involved an interpretation of the standard form comprehensive general liability insurance policy in the context of asbestos-related personal injury damage claims.[5]

---

**4.** Our cases hold that the obligation of an insurer to defend its insured under the provisions of a contract of insurance is determined by the allegations in the tort action. Thus, if the plaintiff in the tort suit alleges a claim covered by the policy, the insurer has a duty to defend. Even if a tort plaintiff does not allege facts which clearly bring the claim within the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy. *See Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, and cases cited at 407–08, 347 A.2d 842 (1975).

**5.** We express no view as to the correctness of either of these decisions in the context of the subject matter there involved.

We shall, therefore, vacate the declaratory summary judgment entered by the trial court in the insurer's favor and remand the case with directions that the court enter a declaratory judgment, as sought by the insured, that at a minimum coverage under the policy is triggered upon exposure to and inhalation of asbestos fibers during the policy period by a person who suffers bodily injury as a result of that exposure. The judgment shall contain a declaration that the insurer is required to provide a defense for Mitchell against all personal injury asbestos-related suits brought by plaintiffs allegedly exposed to Mitchell's asbestos products during the policy period, regardless of when the alleged asbestos-related injuries became manifest. In this regard, Mitchell is entitled to a declaration that the insurer pay its attorney fees, costs, and expenses incurred in litigating the coverage issue and in defending against the asbestos-related personal injury claims. The judgment must also contain a declaration that the insurer shall indemnify Mitchell, within policy limits, for the amount of any judgments rendered against it, or which it may become legally obligated to pay in connection with the asbestos-related claims.

DECLARATORY SUMMARY JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR HARFORD COUNTY FOR THE ENTRY OF A DECLARATORY JUDGMENT CONSISTENT WITH THIS OPINION. COSTS IN THE CIRCUIT COURT FOR HARFORD COUNTY, AND IN THIS COURT, TO BE PAID BY MARYLAND CASUALTY COMPANY.

### APPENDIX A

### AFFIDAVIT OF DR. JOHN E. CRAIGHEAD, M.D.

(Extensive professional qualifications set
forth in affidavit are not included.)

"In this affidavit, I will provide an overview of the mechanisms whereby the various asbestos associated diseases are believed to develop. In addition, I will describe the clinical and experimental evidence which documents how these disease processes evolve over time.

64

"There are bodily injuries and three disease conditions which are believed to be due to or associated with asbestos exposure. These are asbestosis, bronchogenic carcinoma, and mesothelioma. As a pathologist I define an 'injury' to be the alteration of structure and/or function of a cell, tissue or organ. An 'injury' also would include physical or chemical damage to the body which may be detectable only on a microscopic or subclinical level. As a pathologist I define 'disease' as the process of reaction and/or repair to injury. In the discussion which follows of the diseases of asbestosis, bronchogenic carcinoma, and mesothelioma, there are injuries to cells, tissues and/or organs and associated diseases caused by exposure to asbestos fibers as described, notwithstanding the fact that the injuries and diseases may not be noticeable to a harmed individual or diagnosable by a clinician until some later point in time.

"A. *Asbestosis* is a scarring disease of the lungs which results from repeated exposure to high concentrations of asbestos in the ambient air over an extended period of time. The exposures to asbestos that lead to asbestosis far exceed those permitted by Federal regulations at the present time. Nonetheless, some workers in occupational settings in the past did develop asbestosis during the course of their work. Asbestosis is a scarring disease process, and is consequent to injury to the lung tissue which occurs when asbestos fibers accumulate in the small branches of the respiratory tree. When a fiber enters one of the several million air sacs in the lung, it provokes within minutes an irritation which results in an inflammatory response. The inflammatory response consists of the accumulation of various types of cells (known as alveolar macrophages and leukocytes) which are designed by the body to eliminate a foreign particulate or infectious organism. A sequence of responses occur which also have the capacity to injure and damage within minutes of the inhalation of the asbestos fibers the adjacent lung tissue if control mechanisms do not exist. These control mechanisms are often insufficient when the

amounts of asbestos in the ambient air entering the air sacs are substantial.

"B. Like any form of injury that occurs during the course of our daily life, there is an acute stage after which resolution occurs. If one sustains a bruise, it is often red and painful for a period of hours to days, after which the process resolves. When one cuts the skin, the site of the cut is red and painful for a few days, after which it resolves. The process in the lung is comparable. The acute inflammatory response to the presence of asbestos appears within minutes and subsides over the ensuing few days and is followed by a healing phase after which the process is quiescent unless exposure to additional asbestos fibers occur. Each asbestos fiber has the capacity to elicit an inflammatory response. After a worker ceases to be exposed to asbestos in his/her environment, there is no further inflammatory activity and the process is no longer active. If inflammation leads to scarring of the lung as a result of repeated exposures to asbestos, then the scar tissue will remain throughout the life of the individual.

"*Bronchogenic carcinoma*, the typical form of lung cancer, is almost invariably due to cigarette smoking, although a few older individuals appear to develop cancer in the absence of tobacco product abuse. There is evidence that asbestos can enhance the effects of cigarette smoking when and if the exposure is sufficiently prolonged and of sufficient intensity to cause the disease asbestosis. Under these circumstances, asbestos appears to play a role as a promoter of cancer development. As a promoter, it changes the susceptibility of the respiratory mucosa to the carcinogenic substances in cigarette smoke. When asbestos exposure ceases, the promoting effect disappears and it no longer is an important factor increasing susceptibility to the adverse effects of cigarette smoking. Inevitably, one might expect some asbestos workers who smoke to develop lung cancer after occupational exposure to asbestos ceases. This is not surprising, inasmuch as the development of cancer requires

many years of incubation before it becomes a clinically evident disease process which causes symptoms and can be seen by x-ray. Obviously, many asbestos-exposed workers will develop cancer of the lung solely because they have smoked cigarettes.

"The rare tumor, *mesothelioma*, develops after exposure to amphibole asbestos types in approximately 60–80% of cases. This tumor appears to result from the deposition of asbestos fibers in the external lining surface of the lung. Experimental studies have shown that foreign bodies implanted under the skin of animals cause irreversible changes in tissues and cells within a relatively short period after the implant is produced. Even though these changes and injuries to tissues occur, they do not necessarily cause disease that is detectable clinically for many years after exposure to asbestos ceases. Why these disease processes exist for latent periods of 20, 30 or 40 years is not known scientifically, but latency for the development of cancer is quite common in man. Thus, the experimental evidence indicates that the changes that result in mesothelioma may well develop in cells damaged or injured within a short period of time after exposure, but they nonetheless take many years to appear as a clinically-detectable tumor after cessation of exposure to asbestos ceases."

## APPENDIX B

### AFFIDAVIT OF DR. PAUL EPSTEIN, M.D.

(Extensive professional qualifications set
forth in affidavit are not included.)

"Asbestosis is a disease that occurs in lung tissue as a result of prior asbestos exposure. Although asbestos fibers may be deposited in lung tissue in the course of various occupational exposures, household exposures or even ordinary urban dwelling, the disease of asbestosis occurs only when there has been functional impairment of the lung. The human body has extremely effective defense mechanisms to protect the individual from suffering functional

impairment as a result of inhalation of asbestos fibers (or other aerosolized materials). It is only when these defensive responses have produced enough alteration in the structure or physiology of the lung to lead to clinically detectable or symptomatic changes that disease can be said to be present.

"In order for asbestosis to develop in any individual, a series of events must occur. First, asbestos fibers of a respirable size must be inhaled. Most of the inhaled fibers will be trapped in the upper airway by a combination of the turbulent flow of air in the nose and throat and the sticky mucous lining of the upper airway structures. Smaller fibers may evade this defense mechanism and enter the lower respiratory tract, which consists of a series of progressive branching and narrowing bronchial tubes. Many of the fibers that reach this level will settle on the bronchial walls as a result of gravitational forces. The fibers will then be trapped on the mucous lining of the bronchial tubes and will be removed from the lungs by a sweeping action of specialized respiratory lining cells (a mechanism sometimes called 'the mucociliary escalator'). A small minority of inhaled fibers will be deposited at the branching points of the smallest bronchi (respiratory bronchioles) and some may even reach the air sacs (alveoli) of the lung tissue. Most of the fibers that evade the mucociliary system and are deposited in the lower respiratory tract will then be enveloped by dust collector cells known as alveolar macrophages. Many of the alveolar macrophages move upward toward the mucociliary system and are then carried out of the lung. Some alveolar macrophages squeeze through the walls of the air sacs and are carried away from the lung by way of the lymphatic vessels. The asbestos-containing alveolar macrophages which remain in the lung will coat the fiber with a proteinaceous material, effectively sequestering and detoxifying the fiber. The alveolar macrophage will also secrete various chemical substances which attract and stimulate a variety of defensive cells, including neutrophilic white blood

cells and fibroblasts. Both the alveolar macrophage and neutrophilic white blood cells secrete chemicals that are potentially damaging to the alveolar walls. However, this inflammatory process is counterbalanced by a number of anti-inflammatory and protective chemical substances which are released by the cells of the lung. This entire sequence of fiber deposition, clearance, envelopment, sequestration, detoxification, inflammatory response and counterbalancing anti-inflammation is all part of the normal response of the lung to inhalation of foreign fibrous or particulate material. It is only after a period of two decades or more when some asbestos-exposed individuals appear to lose the effectiveness of the counterbalancing anti-inflammation that asbestosis may eventually develop. Even when this balance is lost and alveolar damage is repaired by fibrous tissue deposition, clinical asbestosis does not occur until a large number of alveoli have been affected.

"The stages described in [the above paragraph] which precede the development of widespread pulmonary fibrosis do not constitute disease. It is important to recognize that any or all of these earlier stages may occur without ever progressing to widespread pulmonary fibrosis and, therefore, without ever producing disease.

"Most people who are occupationally exposed to asbestos will never develop asbestosis, even though asbestos fibers can be found in their lungs. It is impossible to predict which of the asbestos-exposed individuals will cross over from the normal defensive activities of the lung to the functional impairment caused by widespread pulmonary fibrosis which we have defined as the disease known as asbestosis."