**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 04-1176**

---

PERDUE FARMS, INCORPORATED,

                                        Plaintiff - Appellant,

        versus

NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PENNSYLVANIA; THE FEDERAL
INSURANCE COMPANY,

                                        Defendants - Appellees,

        and

AMERICAN NATIONAL INSURANCE COMPANY,

                                        Defendant.

--------------------

COMPLEX INSURANCE CLAIMS LITIGATION
ASSOCIATION,

                                        Amicus Supporting Appellees.

---

Appeal from the United States District Court for the District of
Maryland, at Baltimore.  Benson Everett Legg, Chief District Judge.
(CA-99-2818-L)

---

Argued:  March 16, 2005                Decided:  June 2, 2005

---

Before MICHAEL and KING, Circuit Judges, and James R. SPENCER,
Chief United States District Judge for the Eastern District of
Virginia, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Stephen Richard Mysliwiec, DLA PIPER RUDNICK GRAY CARY US, L.L.P., Washington, D.C., for Appellant.  M. Elizabeth Medaglia, JACKSON & CAMPBELL, P.C., Washington, D.C.; Jeffrey Roger Schmieler, SAUNDERS & SCHMIELER, Silver Spring, Maryland, for Appellees.  **ON BRIEF:** Glen K. Allen, DLA PIPER RUDNICK GRAY CARY US, L.L.P., Baltimore, Maryland, for Appellant.  Barbara M. R. Marvin, JACKSON & CAMPBELL, P.C., Washington, D.C., for Appellee National Union Fire Insurance Company of Pittsburgh, Pa.; Alan B. Neurick, William E. Hutchings, Jr., SAUNDERS & SCHMIELER, P.C., Silver Spring, Maryland, for Appellee Federal Insurance Company. Laura A. Foggan, John C. Yang, Paul J. Haase, WILEY, REIN & FIELDING, L.L.P., Washington, D.C., for Amicus Curiae, Complex Insurance Claims Litigation Association, Supporting Appellees.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

After a Florida appellate court affirmed awards for actual damages and for unjust enrichment against it, Perdue Farms Inc. ("Perdue") brought suit in the District Court of Maryland against National Union Fire Insurance Co. of Pittsburgh, PA ("National Union"), Federal Insurance Company and American National Fire Insurance Company seeking indemnification under the advertising liability provisions of the insurance policies at issue.[1] The parties agreed to present the question of coverage to the District Court on cross-motions for summary judgment. The District Court concluded that no reasonable jury could find Perdue's damages covered by the advertising liability provision and awarded summary judgment to National Union. For the reasons that follow, we affirm the grant of summary judgment in favor of the insurance companies.

I.

In 1991, Dennis Hook ("Hook") and his business partner approached Pizza Hut with a unique process for cooking chicken which would allow a fast-service restaurant to prepare and serve a chicken product with the appearance of rotisserie chicken in less

---

[1]The insurance companies are collectively referred to as "National Union" or "the insurer." National Union's policy provided $15 million in commercial liability coverage with Federal Insurance Company covering damages in excess of National Union's limit. Federal's liability is capped at $25 million. Federal's policy is referred to as a "follow form" policy because it provides the same coverage as the National Union policy.

than 10 minutes. The Hook process involved placing pre-seasoned pieces of chicken in a vacuum-sealed bag, refrigerating the chicken after cooking and reheating the chicken by using a microwave in combination with a conventional or pizza impinging oven. In 1992, Pizza Hut and Hook entered into a development agreement with the potential to pay Hook $20 million in royalties.

Pizza Hut and Hook then contacted Perdue as a possible source of chicken for the project. In 1993, Pizza Hut and Perdue signed a confidentiality agreement regarding Hook's process. The parties recognized that the disclosing party, Pizza Hut, possessed certain secret information and the receiving party, Perdue, acknowledged that Pizza Hut intended to develop that secret information but that Pizza Hut would disclose the information to Perdue "for the purpose of development, improvement, and/or possible manufacturing thereof for the sole and exclusive ownership and use by [Pizza Hut]." Furthermore, the parties agreed that Pizza Hut would disclose its secret information for the purpose of "seasoning, process, and product development work related to the development of oven roasted chicken." In exchange, Perdue agreed not to use the secret information for its own account or purposes or for the purposes of any other party. With the Agreements in place, Hook divulged the secrets of his process to Perdue.[2] After a testing period, Pizza Hut decided not to pursue the project and terminated its agreement

---

[2]The Florida jury hearing Hook's case against Perdue would later determine that Hook was a third party beneficiary of the confidentiality agreements.

4

with Hook.  Unknown to Hook, about six months after his visit to the Perdue plant where he shared the secrets of his process, Perdue began to develop a product, using the same preparation techniques, that it would eventually sell under the name "TenderReady."

Not until October 1996, while attending a trade show in Europe, did Hook discover Perdue's efforts to market and sell a pre-marinated, fully-cooked roasted chicken product using Hook's process.  Hook read the sales brochures and other literature and realized that Perdue's marketing materials described the essential, previously confidential nature of his process.  When Hook's demands on Pizza Hut to enforce their confidentiality agreement with Perdue went unheaded, Hook brought suit against Perdue in Florida circuit court to enforce the confidentiality agreements and collect damages for the misappropriation of his trade secret.

In Count I, Hook alleged that Perdue misappropriated his trade secret in violation of the Florida Uniform Trade Secrets Act ("FUTSA").  Hook claimed that the "use of the Process without [his] express or implied consent constitute[d] a misappropriation of the Process because: (1) Perdue acquired the Process under circumstances giving rise to a duty to maintain its secrecy and limit its use, and (2) Perdue derived the Process from or through Pizza Hut, and therefore owed a duty to plaintiffs to maintain its secrecy and limit its use."  Hook charged Perdue with gaining both a commercial advantage  and causing "the actual loss of the independent economic value of the Process."

5

Counts III and IV charged Perdue with breach of the two confidentiality agreements "by misappropriating, using and disclosing the Process without written or implied consent."[3] Notably, in Count IV, Hook asserted that Perdue "breached its duty under the Perdue Confidentiality Agreement by misappropriating and using the Process without express or implied consent."

In the wake of a three week trial, the jury found Hook's process to be a trade secret and that Perdue misappropriated that secret. The Verdict Form specifically asked the jury to find whether "plaintiffs proved by the greater weight of the evidence that their method or process of preparing, storing and serving fresh roasted chicken in a commercial setting is a trade secret?" The next question on the form asked whether "plaintiffs proved by the greater weight of the evidence that defendant misappropriated plaintiff's trade secret?"

The jury also determined Hook to be a third party beneficiary of the two confidentiality agreements and found Perdue in breach. The jury awarded Hook $25 million in actual damages together with $2 million in damages for unjust enrichment which Hook presented as the development costs Perdue saved by co-opting his process. In post-trial proceedings, the trial court awarded Hook $6.75 million in punitive damages based on the jury's finding that Perdue acted

[3]The district court referred to these Counts as Counts II and III, however Count II charged only Pizza Hut with breach of contract.

6

willfully and maliciously in misappropriating Hook's trade secret and assessed pre-judgment interest in the amount of $14,896,602.74 based on the jury's determination that Hook's damages accrued on October 29, 1993, the date Perdue began to develop its "TenderReady" product.

Perdue appealed the decision to the Florida Second District Court of Appeal. The appellate court affirmed the $25 million damage award as well as the $2 million award for unjust enrichment. However, the court reversed the punitive damage award, finding that Perdue's conduct fell below the level of egregiousness necessary to support such an award. As to the prejudgment interest amount, the court found the award "grossly inequitable" and determined that the underlying damage award of $25 million could not be liquidated to a date certain. The court held that the jury's verdict liquidated the amount of Hook's damages and awarded prejudgment interest from April 9, 1999 through May 3, 1999, the date of the final judgment.

Before the appeals court entered its decision, Hook and Perdue signed a "high-low" settlement agreement which guaranteed Hook a minimum of $10 million regardless of the court's decision and capped Perdue's liability at $30 million. Perdue eventually paid Hook $30 million. Perdue then looked to its insurance companies for indemnity and they denied coverage. Perdue sued the insurance companies claiming that coverage existed under the Advertising Liability provision of the insurance policy. Perdue claimed that

its brochures and other advertising literature created its liability to Hook by disclosing, i.e. misappropriating, the details of the Hook "re-thermalization" process.

The contract of insurance provided coverage for liability incurred because of (i) personal injury, (ii) property damage, or (iii) advertising liability. Advertising Liability is defined as liability for damage because of: (a) unintentional libel, slander or defamation of character; (b) infringement of copyright or title or of slogan; (c) piracy or unfair competition or idea misappropriation under an implied contract; or (d) invasion of the rights of privacy, arising out of Perdue's advertising activities. However, coverage is limited by the exclusion provision which disclaims coverage under advertising liability for claims made against Perdue due to its "failure of performance of contract."

Before the district court, the insurers argued that advertising liability is not triggered simply because the insured advertises a product developed using misappropriated trade secrets. They argued that their liability only arises if the offense occurred within the four corners of the advertisement itself. National Union asserted that the jury held Perdue liable because Hook presented evidence that Perdue misappropriated his process by developing and marketing TenderReady in 1993 and not by disclosing the process in its 1995 advertisements. Additionally, the insurers relied on the "failure of performance of contract" exclusion. The

8

insurers argued that this exclusion is applicable because Perdue's liability grew out of its breach of the confidentiality agreement; in other words, Perdue's failure to perform its contractual obligations.

The parties asked the District Court of Maryland to "examine the Florida record, including Hook's Complaint, the [trial] transcript, and the decision of the Florida Appellate Court" to determine whether the underlying judgment captured conduct within the policy's coverage. Specifically, the parties requested that the Court determine what the jury necessarily decided because the jury did not specify the basis for its finding that Perdue misappropriated Hook's trade secret.

The district court held for the insurance companies and denied coverage. Judge Legg thoroughly reviewed the record and determined that it admitted only one conclusion – "the jury found that Perdue misappropriated the Hook process by developing and marketing the TenderReady line of chicken." Perdue Farms Inc. v. Nat'l. Union Fire Ins. Co., 197 F. Supp. 2d 370, 375 (D. Md. 2002) (hereinafter "Perdue Farms I").[4] The court found that Hook pursued a "preemption" theory of damages throughout his litigation and that Hook based Perdue's liability on the fact that Perdue's product

_____

[4]Judge Legg issued two opinions in this case. In the second opinion, Perdue Farms, Inc. v. National Union Fire Insurance Co. of Pittsburgh, P.A., Civil No. L-99-2818 (D. Md., Sept. 10, 2003), the district court found that National Union had a duty to defend Perdue in the underlying Hook lawsuit.

prevented, i.e. preempted, him from licensing his process because restaurants would not license the proprietary process if they could simply purchase the end result from Perdue.

The district court cited three specific instances in the record which demonstrated the jury's acceptance of Hook's preemption theory:

> (i) Perdue's appellate brief before the Florida Court of Appeals stated that, "Hook's theory of actual damages was that the availability of Perdue's TenderReady product deprived Hook of the ability to earn royalties on his process."
>
> (ii) The Florida Court of Appeals concluded that, "Hook's theory of liability was that Perdue's TenderReady product destroyed his ability to market his process."
>
> (iii) The jury's determination that Hook's damages accrued as of October 29, 1993, two years prior to Perdue's advertising at issue.[5]

Perdue Farms I, 197 F. Supp. 2d at 376. The court also examined the individual counts in Hook's Complaint and focused on the relevant exclusion provision in the policy. The court found the exclusion to be fatal to extending coverage for Perdue's liability under Counts III and IV and rejected Perdue's argument that any meaningful distinction exists between the breach of a contract and the failure to perform that same contract. Moreover, the district court found that the confidentiality agreements were express

---

[5]The district court relied on this finding despite the fact that the Florida Court of Appeals subsequently vacated the prejudgment interest award and remanded with instructions to enter an award of prejudgment interest between the dates of the jury verdict and the final judgment.

10

contracts and therefore liability for their breach was not covered under subsection (c) of the Advertising Liability provision.

Finally, with regard to the Florida Uniform Trade Secrets Act, the court found it unlikely that the jury relied upon any factor to impose liability on Perdue other than Perdue's breach of its confidentiality agreements.

This appeal followed. In the present dispute, Perdue relies heavily on perceived inconsistencies between the two opinions issued by the district court to help make its argument.[6] Perdue also asserts an alternate theory of coverage that because the evidence was sufficient for the jury to find either misappropriation of the trade secret by use or by disclosure, the district court should have erred on the side of extending coverage rather than denying it.

II.

The parties dispute the standard of review on appeal, with Perdue urging the Court to apply traditional summary judgment

---

[6]In the second opinion, <u>Perdue Farms, Inc. v. National Union Fire Insurance Company of Pittsburgh, P.A.</u>, Civil No. L-99-2818 (D. Md., Sept. 10, 2003) (hereinafter "<u>Perdue Farms II</u>"), Judge Legg found that National Union had a duty to defend Perdue when Hook filed his complaint. National Union did not appeal that decision. Perdue's reliance on the second opinion is misplaced as it simply recognizes the long-standing position in Maryland law that the duty to defend is broader than the duty to indemnify in that it is based on the potentiality of coverage. <u>See</u> <u>Litz v. State Farm Fire & Cas. Co.</u>, 346 Md. 217, 225 (1997).

review principles to the district court's decision. National Union argues that the parties requested that the district court make factual inferences from undisputed facts and that those factual findings should be upheld unless clearly erroneous. Nothing about this case requires that this Court abandon the familiar refrain that we review the district court's order granting summary judgment de novo. Smith v. Continental Cas. Co., 369 F.3d 412, 417 (4th Cir. 2004). The question before the district court was whether Perdue was entitled to indemnification under its insurance contract with National Union. Such a coverage determination is a legal question which Maryland courts resolve de novo on appeal. See Fister v. Allstate Life Ins. Co., 366 Md. 201, 210 (Md. 2001) ("Because the facts are undisputed, we are left to determine whether the trial court correctly interpreted and applied the relevant law to the uncontested facts.").

In analyzing this appeal, this Court stands in the same position as the district court and will only uphold an award of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civil P. 56(c). As this matter was presented to the District Court of Maryland sitting in diversity, we shall apply Maryland's substantive law in interpreting the

insurance policy.  See Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 82 L. Ed. 1188, 58 S. Ct. 817 (1938).

III.

In determining coverage under an insurance policy, Maryland courts "initially focus on the terms of the insurance policy to determine the scope and limitations of its coverage."  Chantel Assocs. v. Mount Vernon Fire Ins. Co., 388 Md. 131, 142 (1995).  In a typical declaratory judgment action to determine coverage under a policy, "it is the function of the court to interpret the policy and decide whether or not there is coverage."  Mitchell v. Md. Cas., 324 Md. 44, 56 (1991).  To carry out this task, we begin as we would with any other contract – with the terms of the policy itself, see Cole v. State Farm Mut. Ins. Co., 359 Md. 298, 305 (2000), giving the terms their "customary, ordinary, and accepted meaning."  Mitchell, 324 Md. at 56.

In the instant summary judgment action, the parties asked the district court to determine whether the underlying judgment in the Florida court triggered National Union's duty to indemnify Perdue under the policy.  While the duty to defend is broader than the duty to indemnify, see Litz v. State Farm Fire & Cas. Co., 346 Md. 217, 225 (1997) (basing the duty to defend on the potentiality of coverage), the insurer's duty to indemnify depends on the resolution of facts alleged in the complaint.  See Penn-America

13

<u>Ins. Co. v. Coffey</u>, 368 F.3d 409, 413 (4th Cir. 2004); <u>Steyer v. Westvaco Corp.</u>, 450 F. Supp. 384, 389 (D. Md. 1978) ("[T]he question whether the insurer has a duty to pay a final judgment against the insured turns on a comparison of the ultimate findings of fact concerning the alleged occurrence with the policy coverage.").

In this case, Perdue asked the district court to find that National Union owed a duty to indemnify Perdue based on the Advertising Liability provision in the policy. To require National Union to indemnify Perdue, we must determine whether Perdue's liability to Hook in the underlying action was because of "idea misappropriation under an implied contract" arising out of Perdue's advertising activities. We first look to see whether Perdue demonstrated that its liability to Hook arose out of its advertising brochures.

National Union's duty to indemnify Perdue for its liability under Counts III and IV of the Complaint are the easiest to dispose of on summary judgment. Whether or not we conclude that the jury based its misappropriation finding on Perdue's disclosure of Hook's process in its advertising activities, we find as a matter of law that the exclusion for "failure of performance of contract" bars coverage under the breach of contract claims. Hook's Complaint and the jury verdict make this conclusion obvious.

Hook clearly charged Perdue with breaching the two confidentiality agreements. Although Count III alleged that Perdue breached its duty under the agreement "by misappropriating, using and _disclosing_" the process, the evidence before the jury clearly established that Hook's injury occurred because Perdue used his process contrary to the confidentiality agreements to develop a product that would preempt him from licensing his process. The jury weighed the evidence and concluded that Perdue breached both of the agreements.

No matter how artfully Perdue attempts to construe its actions, Perdue failed to perform its obligations under the confidentiality agreements. Perdue expressly agreed not to use any proprietary information it gained under the confidentiality agreement. Whether or not Perdue used the information to develop the process, which the jury determined to be a trade secret, or disclosed the process in its advertisements, the jury found that Perdue breached the agreements and therefore the coverage exclusion applies.

Disposition of Count I requires further discussion. FUTSA defines "misappropriation," in relevant part, as

> [d]isclosure or use of a trade secret of another without express or implied consent by a person who ... [a]t the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

15

Fla. Stat. § 688.002. FUTSA provides for injunctive relief, Fla. Stat. § 688.003, and damages based on actual loss and unjust enrichment based on the misappropriation as well as exemplary damages up to twice the amount awarded for actual loss and unjust enrichment, Fla. Stat. § 688.004. Under Count I, Hook alleged that "Perdue's use of the Process without plaintiffs' express or implied consent constitute[d] a misappropriation of the Process."

The question the Court must answer is whether the jury based Perdue's liability on its disclosure or use of Hook's trade secret. The best place to start is with the jury's verdict. After concluding that Perdue misappropriated Hook's trade secret and breached the two confidentiality agreements, the jury determined that Hook was entitled to $25 million in actual damages and $2 million for unjust enrichment. Additionally, the jury found that Hook's damages accrued on October 29, 1993.

As noted by the Florida Court of Appeals, the damage award derives factual support from the confidential development agreement between Hook and Pizza Hut. Titled "Project Feathers," the agreement consisted of three phases. During the first phase, the parties set to developing the process and product. Phase Two implemented the final result of the development phase in which Pizza Hut agreed to pay a royalty of $0.036 per pound of chicken product sold up to $5 million. Phase Three, labeled "earn out," reduced the per pound royalty and capped the payout at $15 million.

16

Hook also entered into a separate agreement with KFC Corporation, a Pizza Hut affiliate, for a capped royalty of $5 million.

Although this gives a basis for the jury's award, the unjust enrichment award and the accrual date indicate that the jury focused its attention on Perdue's use of the process to develop its own product rather than its advertising activities. Certainly Perdue was not unjustly enriched because it co-opted Hook's advertising idea and so did not have to spend its time and effort on creating a marketing strategy. Rather, Perdue benefitted from Hook's disclosure of his process and was able to forego some of the development costs in bringing its product to market. The jury valued those foregone development costs at $2 million, an amount the Florida Court of Appeals upheld without discussion. Finally, the jury concluded that Hook's damages began to accrue on October 28, 1993, presumably relying on an internal Perdue memorandum describing a request for a new product sample: eight pieces of chicken marinated and seasoned with Perdue (and not Pizza Hut) seasoning utilizing the cook-in-the-bag process. Each of these facts,[7] taken together, cause us to conclude that the jury based Perdue's liability on its use and development of Hook's process in violation of the confidentiality agreements.

---

[7]The jury also rejected Perdue's argument that Hook's process was not a trade secret.

17

Finally, although we do not have the benefit of over 3000 pages of trial transcript from the three week jury trial, the record does contain excerpts of Hook's testimony in which he describes how Perdue's product preempted him from selling his chicken technology. Hook testified that when he discovered the TenderReady product brochure at the Paris trade show, he contacted Genevieve Friedman, with Perdue, and questioned her about the product. According to Hook, he inquired whether TenderReady was "the Pizza Hut product" and Ms. Friedman affirmed that it was. Hook next contacted his business partner and informed him that the Pizza Hut chicken was "out on the street and its new name is TenderReady."

Hook testified that he could no longer make money licensing the technology for his process because of the Perdue product's presence "on the street." Hook also claimed that he was entitled to a consulting fee for the time period that Perdue began selling the product back in 1993. Hook's business partner testified that Perdue's sales of TenderReady "effectively completely pre-empts us from the marketplace." He explained that Hook was selling technology and that

> [i]f we were to go to any one of these companies at any time, today, for example, and we were to say to them ... "We think that we've got this great idea, and we would like you to pay us consulting fees and rights on the product that would amount to a lot of money. By the way, you don't have to buy – you don't have to do this. You can go to Perdue, and they will sell it to you for none of this."

18

Trial Transcript at 529. The witness clearly referred to the fact that by developing the end product, Perdue prevented Hook from licensing his process. In addition, Hook's expert witness testified "that the TenderReady product was copied from the Dennis Hook process" and that Perdue essentially "stole or used the same process from Dennis Hook to produce their product."

The record before us leads to the obvious conclusion that the ultimate findings of fact from the Hook trial take the instant case outside of the policy coverage. Perdue's liability did not result from its advertising activities and, therefore, any misappropriation under FUTSA resulted from Perdue's use of Hook's trade secret to develop a product in violation of the confidentiality agreements.[8]

IV.

Accordingly, we hold that the Hook jury determined that Perdue misappropriated Hook's process by using it to develop its own product. Perdue's liability did not arise out of its advertising

---

[8]It does not appear that the FUTSA requires a duty external to a contract in order to impose liability for its violation. See Fla. Stat. § 688.008; Tender Boat Ramp Sys., Inc. v. Hillsborough County, 54 F. Supp. 2d 1300, 1302 (M. D. Fla. 1999) (discussing the two elements for a claim of misappropriation of a trade secret under FUTSA). Although the district court noted that the trial court in the underlying action did not "advise the jurors that the duty of confidentiality must have arisen from a source other than the confidentiality agreements themselves," we need not address this issue in deciding whether National Union owes a duty to indemnify.

19

activities or disclosure of the trade secret but even if it did, the underlying action was premised on Perdue's breach of the confidentiality agreements, precluding coverage under the policy exclusion for "failure of performance of contract."  We therefore affirm the order granting summary judgment to National Union.

<u>AFFIRMED</u>