806 A.2d 274

John W. CALLAWAY, Individually, etc.

v.

MAMSI LIFE AND HEALTH INSURANCE COMPANY.

No. 00163, Sept. Term, 2001.

Court of Special Appeals of Maryland.

June 26, 2002.

Reconsideration Denied Sept. 30, 2002.

John B. Robins, IV, Salisbury, for appellant.

Demetrios G. Kaouris (Richard A. DeTar and Miles & Stockbridge, P.C., on the brief), Easton, for appellee.

Argued before HOLLANDER, SALMON, GERARD F. DEVLIN (Retired, Specially Assigned), JJ.

HOLLANDER, Judge.

This life insurance dispute arises from the death of David Callaway (the "Decedent" or the "Insured"), who died in July 2000, at the age of 39, as a result of autoerotic asphyxiation. At the time of death, the Decedent was the named insured under a group life insurance policy (the "Policy") issued by MAMSI Life and Health Insurance Company ("MAMSI" or the "Insurer"), appellee. John Callaway, the Decedent's brother, and John Callaway, Jr. and Bennett J. Callaway, the

Decedent's nephews, are the beneficiaries of the Policy and the appellants.

MAMSI refused to pay death benefits to the beneficiaries, asserting two grounds: 1) the Decedent's death was not the result of an accident, as required by the Policy; and 2) the Policy excluded coverage for death resulting from intentional self-injury. Thereafter, John Callaway, individually and as parent and guardian of his two sons, filed suit in the Circuit Court for Wicomico County against the Insurer, claiming breach of contract.

The parties subsequently filed cross-motions for summary judgment. At the conclusion of the motions hearing, the circuit court ruled that the Insured's death was not the result of an accident, but was the result of an intentional self-injury. Therefore, the court granted summary judgment in favor of MAMSI. From that decision, appellants noted this appeal. They present several questions for our consideration, which we have combined and rephrased for clarity:

1. Did the court err in granting summary judgment in favor of MAMSI, on the ground that the Insured's death was not the result of an accident under the terms of the Policy?

2. Did the court err in granting summary judgment in favor of the Insurer, on the ground that the Insured's death was the result of an intentional self-injury under the terms of the Policy?

For the reasons that follow, we shall reverse.

## FACTUAL BACKGROUND

The circumstances of the Insured's death are not in dispute. They are pertinent to the question of whether the death was the result of an accident or an intentional self-injury.

The Insured's body was found at his residence on the evening of July 5, 2000, when Detective James Seibert of the Wicomico County Sheriff's Office was notified of an unattended death and proceeded to the Insured's home. In his report, Detective Seibert described the scene of the bedroom where

the Insured's body was recovered. The detective observed the nude body of the Insured, on his back. The Insured's hands were tied behind his back, and his feet were bound together at the ankles with rope. A plastic bag covered the head of the body, and a brown belt was tightened around the neck. Detective Seibert also observed that the wall opposite the body "was covered with a large amount of centerfold pictures of naked females." His report continued:

> D/Sgt. Seibert further observed a white ... rope tied around the body's neck, with this rope extending up to the ceiling. D/Sgt. Seibert observed this rope enter into a pulley mechanism, which was embedded into the ceiling. This rope then extended along the ceiling toward the bedroom's entrance door. Near the door entrance, this rope entered a second pulley embedded into the ceiling. Attached to this rope was a 25 lb weight training plate, which was pulled up to the ceiling. The weight appeared to be suspended up toward the ceiling by the weight of the body. The rope then extended down to the floor, and over the feet of the body.

An autopsy was performed at the office of the Chief Medical Examiner on July 6, 2000. According to the Death Certificate dated July 10, 2000, signed by Assistant Medical Examiner Stephen S. Radentz, M.D., the "immediate cause" of the Insured's death was "asphyxiation," and the manner of death was an "Accident." The Death Certificate contains a box labeled "Describe how injury occurred," and the physician inserted "Autoerotic activity."

The Report of the Post Mortem Examination, dated October 11, 2000, also indicates that the Insured "died of ASPHYXIA-TION," and that "[t]he manner of death is ACCIDENT."[1] According to the Post Mortem Report, the body had "a plastic bag over the head and ligatures about the neck, wrists, and ankles...." Upon removal of the ligatures, however, "there

---

1. The report contains five pre-printed categories with respect to the manner of death. These are: Natural, Suicide, Homicide, Accident, and Undetermined.

was no evidence of injury to the underlying neck, wrists and ankles." In addition, the Decedent had "a piece of insulated electrical wire with two metallic 'alligator' clips at both ends attached to [his] nipples...."

The section of the report titled "Evidence of Injury" refers to the release mechanisms employed by the Decedent. It states, in part:

> There was also a yellow 1/4″ synthetic rope attached to the loop binding the hands with a quick release knot secured by a wooden clothes pin. This rope was attached to a pulley to the above-mentioned leather belt around the neck and, according to the investigation reports, was strung through two additional pulleys attached to the ceiling of the room with a 25–pound weight at the end. Reportedly, an additional piece of rope was tied to the line at the ceiling between the pulleys. Pulling of this rope would cause lifting of the attached weight, releasing the tension applied to the neck loops and wrists. The legs were tied at the level of the malleoli with four loops of 1/4″ cotton rope tied between the legs, with transverse loops forming a Figure "8" knot.... The deceased held a 4–1/2 foot long strap in his right hand.

The Medical Examiner opined:

> This 39–year–old white male, DAVID CALLAWAY, died of ASPHYXIATION. The manner of death is ACCIDENT. The decedent was discovered in his secured residence with a plastic bag secured over his head, a belt about his neck, and his wrists and ankles bound. *The bindings were elaborate and had several "escape" mechanisms.* Erotic materials (photographs) were also present. *The results of the autopsy and investigation indicate that the decedent accidentally asphyxiated (suffocated) while engaged in an erotic activity.* The complexity of the arrangements is typical for such activity; psychological background of such undertakings is complex and not entirely understood....

(Emphasis added).

It is undisputed that the Insured was killed by asphyxiation as a result of his voluntary participation in a sexual activity

known as autoerotic asphyxiation. For purposes of this case, the parties agree that there is no indication that the Decedent died as a result of homicide, suicide, foul play, or natural causes, and that the suffocation was an unintended consequence of the autoerotic activity.

Autoerotic asphyxiation, also known as autoerotic hanging, "is the practice of inducing cerebral anoxia, usually by means of self-applied ligatures or suffocating devices, while the individual masturbates to orgasm...." [2] Ligatures around the neck, and other suffocation devices, are used for the purpose of "limiting the flow of oxygen to the brain during masturbation in an attempt to heighten sexual pleasure." *Todd v. AIG Life Ins. Co.,* 47 F.3d 1448, 1450 (5th Cir.1995). Nerve centers in the brain are stimulated by asphyxia, which "produces a state of hypercapnia (an increase in carbon dioxide in the blood) and a concomitant state of hypoxia (a decrease in oxygen in the blood), all of which result in an increased intensity of sexual gratification." *Padfield v. AIG Life Ins. Co.,* 290 F.3d 1121, 1125, 2002 U.S.App. Lexis 9422 (9th Cir.2002); *see Conn. Gen. Life Ins. Co. v. Tommie,* 619 S.W.2d 199, 202 (Tex.Civ.App.1981).

---

2. *See http://members.aol.com/bjo22038/index.html; Markc63@aol.com.* In support of their motion, appellants provided the circuit court with medical literature concerning the practice of autoerotic asphyxiation. As MAMSI does not quarrel with the content of the literature, we have incorporated information about the sexual disorder obtained from that literature. We have also included information obtained from other cases discussing the disorder.

With respect to the disorder, the record in this case is not as well developed as we would have expected. Apart from the autopsy report, neither side presented expert testimony or affidavits from expert witnesses regarding autoerotic asphyxiation. Moreover, the literature reveals that people usually survive when they engage in autoerotic asphyxiation. Although the issue of "injury" is central to this case, the record does not contain information about whether those who survive endure some degree of physiological "injury" to the brain or body as a result of the partial asphyxia that is involved in the sexual activity.

Given the limited record, we initially considered a remand, so that the court below could address the issue. Upon reflection, however, we have decided that further delay is not warranted. Instead, we shall draw on the information about the sexual disorder referred to above.

According to the Diagnostic and Statistical Manual of the American Psychiatric Association (Fourth Edition), known as DSM–IV, autoerotic asphyxiation, or "hypoxyphilia," is a mental disorder in the category of Sexual Masochism. The DSM–IV indicates that the practice involves "sexual arousal by oxygen deprivation obtained by means of chest compression, noose, ligature, plastic bag, mask, or chemical...." DSM–IV, § 302.83, at 529.

Those who practice autoerotic asphyxiation typically utilize some type of escape mechanism to protect against suffocation in the event of a loss of consciousness. Nevertheless, the DSM–IV indicates that "accidental deaths sometimes occur" as a consequence of the practice, primarily due to "equipment malfunction, errors in the placement of the noose or ligature, or other mistakes...." DSM–IV, § 302.83, at 529. The DSM–IV estimates that "two hypoxphilia-caused deaths per million population are detected and reported each year." *Id.*

In an article published in 1996, titled "The Autoerotic Asphyxiation Syndrome In Adolescent and Young Adult Males," submitted by appellants to the court below, the author describes autoerotic asphyxiation as an "abnormal sexual behavior," and notes that it is "probably the most bizarre and dangerous" of the "paraphilias...." According to the author, those who engage in the practice do not seek to become so strangled as to lose consciousness. Rather, as the author explains, "sexuoerotic arousal and attainment of orgasm depend on self-strangulation and *asphyxiation up to, but not including, loss of consciousness.*" (Emphasis added). The author notes that sexual sensation is enhanced "through interference with the blood supply to the brain, causing cerebral anoxia," but the degree of that anoxia is only meant to reach the point at which it "is *subjectively perceived as giddiness, lightheadedness, and exhilaration,* which reinforces the mastubatory sensation."

The article indicates that constriction of the neck is the most common methodology used to attain the desired sexual arousal. It is not, however, the exclusive method. Other

mechanisms include the placement of a plastic bag over the head, the use of chemical vapors, and "passing electrical current through the body...."

Of significance here, the author states:

Neck constriction, being most common, is accomplished by placing some form of ligature around the neck that is *designed to give the victim control of the pressure and provide an escape mechanism.* Transient cerebral hypoxia during autoerotic manipulation combined with physical helplessness and self-endangerment to the degree that life is threatened, enhances sexual gratification—but it also weakens the victim's self control and judgment, *occasionally resulting in accidental death from the failure of or the victim's inability to operate previously arranged self-rescue mechanisms.*

(Emphasis added). Thus, the author observes that *"the asphyxiator's sexual practice is usually first discovered when he dies from accidental hanging."* (Emphasis added).

In describing those who engage in the practice, the author points out that it "is seen in all races, in all parts of the world, and in all socioeconomic levels." Although asphyxiators are typically adolescents or young adult males, adults also engage in the activity, and the adult asphyxiators are generally heterosexual. According to the author, *"Adults tend to be more sophisticated in their mastubatory ritual and are aware of the death orientation of the practice.* This is probably due to elaboration over time." The author observes: *"Most often, the adult or adolescent asphyxiator has no known history of deviant sexual behavior. This practice is revealed only when the victim dies in an accidental hanging death."* (Emphasis added).

The article refers to one authored by R. Hazelwood, P. Dietz, and A. Burgess, entitled "The Investigation of Autoerotic Fatalities," Journal of Police Science and Administration (1981), at 104. That study describes the characteristics of most autoerotic asphyxiation "death scenes." Of particular relevance, the authors note:

1. Evidence of asphyxia produced by strangulation either by ligature or hanging, in which the position of the body or presence of protective means such as padding about the neck, *indicate that the death was not obviously intended.*

2. Evidence of a physiological mechanism for obtaining or enhancing sexual arousal and *dependent on either a self-rescue mechanism* or the victim's judgment to discontinue its effects.

\* \* \*

6. No apparent suicide intent.

(Emphasis added).

As we noted, when the beneficiaries sought to recover the death benefits under the Policy, MAMSI denied payment, claiming that: 1) the Insured's death was not the result of an accident; and 2) the Insured's death was the result of intentional self-injury. Consequently, on October 16, 2000, the beneficiaries instituted suit against MAMSI, alleging breach of the insurance contract.

The Policy provides for the payment of death benefits if the Insured sustained a covered loss, which is defined to include loss of life "because of an injury caused by an accident." The terms "accident" and "injury" are not defined, however. The Policy also includes various "Exclusions," one of which bars coverage if death results from "intentional self-injury."

The Policy states, in pertinent part:

*ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS*

*Benefit Payable*

If an *Insured* suffers a covered loss because of an injury caused by an accident, the loss must occur within 90 days after the date of the accident. . . .

A covered loss means:

● loss of life. . . .

\* \* \*

*Exclusions*

No benefit will be paid for any loss that results from or is caused directly, indirectly, wholly or partly by:

• intentional self-injury, suicide or attempted suicide, while sane or insane;....

\* \* \*

• a physical or mental sickness or treatment of that sickness

Following the motions hearing on February 20, 2001, the court granted the Insurer's summary judgment motion. The court reasoned:

[I]t appears to this Court as both counsel agree that the policy involved in this case is unambiguous. It provides for the payment of benefits if an insured suffers a covered loss because of an injury caused by an accident. A covered loss is loss of life. So, therefore, if death occurs because of an injury caused by an accident, then there would be the payment of benefits from the Defendant to the Plaintiff. However, if death was not due to an injury caused by an accident, then the policy does not provide coverage.

The Court believes that this case, the policy language is for legal purposes basically the same as the policies that covered death as a result of accidental means.

I have a great deal of difficulty finding any difference between that language and the language used in this case.

The issue was dealt with in *Consumers Life Insurance Company versus Smith* [86 Md.App. 570, 587 A.2d 1119, *cert. denied,* 323 Md. 185, 592 A.2d 178 (1991)], and there, the Court found that when somebody got drunk and drove an automobile and ran into a tree or something of that nature, then the bodily injury was caused by accident.

The Court made the distinction between accidental death and death by accidental means, and the Court used the language, the direct and proximate cause of the death of the insured was an automobile accident. He did not die from intoxication. Had he died from intoxication, then at least in my opinion, there would have been no coverage in that case, and had he died from intoxication, the Court believes that

the facts in that case would have been analogous to the facts in this case.

In this case, the insured intended to cut off his air supply. The cutting off of the air supply caused his death. The Court believes that that is not a death caused because of an injury caused by an accident. He intended the act that resulted in his death. So the Court is going to grant the Defendant's Motion for Summary Judgment.

In addition, the Court believes that when you intend to cut off your air supply, you are causing a self-injury and that the exclusion would also apply to exclude benefits in this case. Therefore, the Court will enter Summary Judgment in favor of the Defendant.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Maryland Rule 2–501(e) establishes a two-part test that governs summary judgment. The trial court must decide whether there are any genuine disputes of material fact and, if not, whether either party is entitled to judgment as a matter of law. *Jones v. Mid–Atlantic Funding Co.*, 362 Md. 661, 675–76, 766 A.2d 617 (2001); *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737–38, 625 A.2d 1005 (1993); *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md.App. 470, 488, 665 A.2d 297 (1995), *cert. denied,* 341 Md. 172, 669 A.2d 1360 (1996). Summary judgment is not a substitute for trial, however. *Mayor and City Council of Baltimore v. Ross,* 365 Md. 351, 359, 779 A.2d 380 (2001).

We review, *de novo,* an order granting summary judgment. *Tyma v. Montgomery County,* 369 Md. 497, 504, 801 A.2d 148, No. 20, September Term, 2001 (2002); *Green v. H & R Block, Inc.,* 355 Md. 488, 502, 735 A.2d 1039 (1999). Our task is to determine if the trial court reached the correct legal result. *Murphy v. Merzbacher,* 346 Md. 525, 530–31, 697 A.2d 861 (1997); *Goodwich v. Sinai Hosp. of Baltimore, Inc.,*

343 Md. 185, 204, 680 A.2d 1067 (1996). This requires us to undertake the same analysis as the trial court; we evaluate the identical material from the record, and decide the same legal issues presented to the circuit court. *Lopata v. Miller,* 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied,* 351 Md. 286, 718 A.2d 234 (1998). Ordinarily, we will uphold the grant of summary judgment "only on the grounds relied upon by the trial court." *Blades v. Woods,* 338 Md. 475, 478, 659 A.2d 872 (1995); *see Gross v. Sussex,* 332 Md. 247, 254 n. 3, 630 A.2d 1156 (1993); *Hoffman v. United Iron and Metal Co.,* 108 Md.App. 117, 132–33, 671 A.2d 55 (1996).

█ When, as here, both sides file cross motions for summary judgment, it does not follow that the circuit court must grant one of the motions. *See Regal Savings Bank v. Sachs,* 352 Md. 356, 372, 722 A.2d 377 (1999). All inferences are resolved in favor of the non-moving party, *Southland Corp. v. Griffith,* 332 Md. 704, 712, 633 A.2d 84 (1993), and undisputed facts may give rise to conflicting inferences that are not appropriate for resolution by summary judgment. Moreover, even if the facts are undisputed, the appellate court must still determine whether the trial court accurately interpreted the applicable law and correctly applied it to the undisputed facts. *Fister v. Allstate Life Ins. Co.,* 366 Md. 201, 210, 783 A.2d 194 (2001).

At this juncture, we pause to summarize the tenets that govern the construction of insurance contracts. It is well settled that "the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts...." *Mitchell v. AARP,* 140 Md.App. 102, 116, 779 A.2d 1061 (2001); *see Cole v. State Farm Mut. Ins. Co.,* 359 Md. 298, 305, 753 A.2d 533 (2000); *Philadelphia Indemn. Inc. Co. v. Maryland Yacht Club, Inc.,* 129 Md.App. 455, 467, 742 A.2d 79 (1999). The court bears responsibility for ascertaining the scope and limitations of an insurance policy, to determine whether there is coverage. *Fister,* 366 Md. at 210, 783 A.2d 194; *Cole,* 359 Md. at 305, 753 A.2d 533; *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.,*

324 Md. 44, 56, 595 A.2d 469 (1991). That process begins with the review of the text of the policy. *See Cole*, 359 Md. at 305, 753 A.2d 533; *Kendall v. Nationwide Ins. Co.*, 348 Md. 157, 165, 702 A.2d 767 (1997); *Chantel Assoc. v. Mount Vernon Fire Ins. Co.*, 338 Md. 131, 142, 656 A.2d 779 (1995). As with any contract, we consider the policy as a whole. *Consumers Life Ins. Co. v. Smith*, 86 Md.App. 570, 574, 587 A.2d 1119, *cert. denied*, 323 Md. 185, 592 A.2d 178 (1991). In addition, we "examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486 (1985).

▮▮▮ In " 'deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself.' " *Universal Underwriters Ins. Co. v. Lowe*, 135 Md.App. 122, 137, 761 A.2d 997 (2000) (quoting *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 779, 625 A.2d 1021 (1993)). As with other contracts, "we analyze the plain language of [an insurance] contract according to the words and phrases in their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Universal Underwriters Ins. Co.*, 135 Md.App. at 137, 761 A.2d 997; *see Mitchell*, 324 Md. at 56, 595 A.2d 469. Generally, we construe the words of an insurance policy in a way that is consistent with their customary and accepted meanings, *Fister*, 366 Md. at 210, 783 A.2d 194. But, if there is evidence that the parties intended to ascribe a special or technical meaning to certain words used in an insurance contract, those words are construed in accordance with that understanding. *See Dutta v. State Farm Ins. Co.*, 363 Md. 540, 556, 769 A.2d 948 (2001). Moreover, when the terms of an insurance contract "are derived from explicit statutory guidelines," *Fister*, 366 Md. at 210, 783 A.2d 194, then the interpretation of the applicable statutory provisions is "the paramount consideration . . . ." *Id.*

■■■ If the court deems the provisions of an insurance policy unambiguous, the meaning of the terms is determined by the court as a matter of law. *Cole,* 359 Md. at 305, 753 A.2d 533. A policy term is considered "ambiguous if, to a reasonably prudent person, the term is susceptible to more than one meaning." *Id.* at 306, 753 A.2d 533. The test to determine ambiguity "is not what the insurer intended its words to mean. . . . The criterion is ambiguity from the standpoint of a layman. . . ." G.J. Couch, 2 *Couch Cyclopedia of Insurance Law* (2d ed.1959), § 15:84, at 416–418; *see Consumers Life,* 86 Md.App. at 575, 587 A.2d 1119. When a term in an insurance policy is found ambiguous, "a court will construe the ambiguous term against the drafter of the contract." *Cole,* 359 Md. at 317, 753 A.2d 533; *see Fister,* 366 Md. at 218 n. 11, 783 A.2d 194; *Bushey v. Northern Assurance Co. of America,* 362 Md. 626, 632, 766 A.2d 598 (2001); *Cheney v. Bell Nat'l Life Ins.,* 315 Md. 761, 766–67, 556 A.2d 1135 (1989). If a term is ambiguous, we may use "extrinsic sources such as dictionaries," to ascertain the meaning. *Cole,* 359 Md. at 317, 753 A.2d 533; *see Consumers Life,* 86 Md.App. at 575, 587 A.2d 1119. Nevertheless, Maryland does not subscribe to the doctrine that insurance contracts are automatically construed "most strongly against the insurer." *Bushey,* 362 Md. at 632, 766 A.2d 598; *see Mitchell,* 324 Md. at 56, 595 A.2d 469.

Neither side has suggested that the Policy here is ambiguous. Nevertheless, two key terms—"accident" and "injury"— are not defined in the Policy. Moreover, it is apparent that the parties do not interpret or apply those terms in the same way.

■■■ In filing cross motions for summary judgment, the parties agreed below that there were no disputes as to material fact. Nevertheless, having lost below, appellants now seem to retreat from that position. In this regard, what the Court said in *Mears v. Town of Oxford,* 52 Md.App. 407, 423, 449 A.2d 1165, *cert. denied,* 294 Md. 652 (1982), is pertinent:

Appellant cannot have it both ways, arguing that he should be granted summary judgment because there are no genuine disputes of material facts but that his opponent should not be granted summary judgment because there are genuine disputes over material facts.

In any event, appellants now seem to attach significant weight to the fact that the Insured "incorporated several 'escape mechanisms' into his elaborate system." They argue that the use of the escape mechanisms gives rise to an inference favorable to them, but not drawn by the circuit court, that the Decedent did not intend to injure himself, and only suffered injury and death because the release mechanisms malfunctioned. Appellants thus suggest that appellee's concession that the Insured did not intend to commit suicide does not go far enough; they urge that the escape mechanisms inferentially show that the Insured did not even intend to injure himself. Therefore, for purposes of summary judgment, when looking at the facts in the light most favorable to them, appellants contend that the court should have found a factual dispute as to whether the death was the result of an accident or an intentional, self-inflicted injury.

To support their claim that the court failed to draw the inferences in their favor, appellants point to a comment by the trial judge at the hearing, in which the judge suggested that there was no evidence that the Decedent "ever attempted to use any of those release systems." Appellants have misconstrued the court's comment and, in doing so, they have overlooked the purpose of such a hearing. It is apparent that the judge was engaged in a dialogue with counsel for the purpose of elucidating the issues; he was inquiring, as he should, so that he could gather and understand all pertinent information about the issues pending before the court. There is no indication from the comment that the judge had any fixed or immutable idea of what occurred, nor that he had decided that the escape mechanisms had no significance. Nor is there any indication that the comment in question was the basis for the court's eventual ruling.

In our view, appellants' assertion as to the escape mechanism does not give rise to a dispute of material fact. It is now, as it was below, uncontroverted that the Decedent sought to utilize escape mechanisms, and they did not work as contemplated. Moreover, MAMSI has agreed that the Insured did not intend to kill himself. It follows that the Insured did not intend to inflict a fatal injury upon himself.

As the Insurer sees it, however, the Decedent's use of the escape mechanisms supports another inference: the Insured appreciated the grave risk of his conduct. MAMSI asserts:

> The existence of the escape mechanisms leads to a reasonable inference that the Insured recognized he was engaging in an activity that could foreseeably lead to his death.

Further, MAMSI contends that death was the foreseeable result of such conduct. Thus, the Insurer maintains that the Insured's death was not the result of an accident. It states:

> Under the circumstances of this case, the asphyxiation of the Insured was not an event that took place without his foresight or expectation. It was purposefully induced as part of the practice of autoerotic hanging. Stated differently, the Insured's asphyxiation was not unforeseen, unusual, or unexpected. Accordingly, the Insured's death was not the result of an injury caused by accident.

As we noted, undisputed facts may give rise to conflicting inferences. Here, the undisputed fact that the Decedent sought to utilize escape mechanisms gave rise to multiple inferences, but they are not necessarily inconsistent or incompatible.

From appellee's perspective, the escape mechanisms suggest that the decedent was aware of at least some risk associated with his conduct. If not, it is hard to conceive of why the Insured would have sought to use the escape devices. Nevertheless, appellee has not established whether the Insured appreciated the gravity of the risk. It may be that the Decedent believed the risk of death or serious injury was small, but thought it was better to be safe than sorry. Conversely, he might have believed the risk of harm was substan-

tial. Because it is probably impossible to ascertain what the Insured thought, the understanding of a reasonable person, similarly situated, may take on significance.

From appellants' perspective, the escape mechanisms suggest that the Insured did not intend to die, or to injure himself in such a way as to lead to death. He did intend, however, to restrict temporarily the flow of oxygen to his brain, and he died from the process set in motion by that conduct. The question arises as to whether the knowing deprivation of oxygen, even briefly, constitutes an "injury" under the Policy, in light of the circumstances attendant here.

Based on the language of the Policy, the Insurer asserts that "the issue is whether the injury (i.e., asphyxiation) resulting in death was caused by an accident, not whether the resulting death was accidental." Even if the Insured's death was unintentional, the Insurer maintains that the Insured intentionally induced asphyxiation, which was itself an injury. According to MAMSI, the Insured's voluntary use of suffocation devices, such as a noose, plastic bag, and ligatures, with the deliberate purpose of reducing the flow of oxygen to the brain, constituted "an intentional infliction of self-injury." Therefore, the Insurer contends that the "death was due to an injury, asphyxiation, which was purposefully induced by the Insured as part of the practice of autoerotic hanging."

## II.

Appellants focus primarily on *Consumers Life Ins. Co.*, 86 Md.App. 570, 587 A.2d 1119, to support their position that they are entitled to recover under the Policy. There, the insured died as a result of a vehicular collision that occurred when he was driving while intoxicated. At the time of death, the insured was covered under a group life and accidental death policy. It provided for double indemnity benefits in the event of death from "an accidental, bodily injury which results directly and independently of all other causes," and not from any of the excepted risks, such as intentional, self-inflicted injury. *Id.* at 572, 587 A.2d 1119. Although the insurer paid

the ordinary benefit, it refused to pay the double indemnity. Consequently, the beneficiary filed suit, and both sides later filed cross motions for summary judgment.

In support of its position, the insurer argued that driving while intoxicated constituted a criminal act "involving substantial risk of harm." *Id.* at 577, 587 A.2d 1119. Moreover, the insurer maintained that serious bodily injury and death "were the readily foreseeable consequences of such conduct and [were] ... not accidental within the contemplation of the insurance policy." *Id.* After the trial court granted the beneficiary's motion, the insurer appealed.

On appeal, we considered whether the term "accidental bodily injury" included a fatal injury sustained when the insured "engaged in proscribed behavior, i.e., driving while legally intoxicated." *Id.* at 571–72, 587 A.2d 1119. Writing for the Court, Judge Davis said that "the word 'accident' is not ambiguous to a reasonably prudent person." *Consumers Life Ins. Co.*, 86 Md.App. at 574, 587 A.2d 1119. After reviewing various dictionary definitions of the word "accident" as an aid to the Court, we held that the insurer was liable, "notwithstanding that the insured may have been injured as a result of violating the law, '[since] it does not appear that the policy was obtained in contemplation of such violation and the danger consequent thereon.'" *Id.* at 578, 587 A.2d 1119 (quoting Appleman, *supra*, § 511 at 394–95). The Court reasoned:

The direct and proximate cause of death of the insured was an automobile accident; he did not die from intoxication. Moreover, no evidence was presented to the trial court in the instant case that the decedent intended to injure himself or commit suicide. The police and autopsy reports state that the decedent died in an "accident." The fact that the decedent ingested alcohol does not make his death intentional, planned, foreseen or expected.... Moreover, while intoxication may be dangerous and expose the drinker to a risk, it does not bar recovery under an accidental life insurance provision. "Intentional, unnecessary exposure to

risks, as well as the negligent creation of risks to one's own safety may not prevent the result from being accidental." *Id.* at 580–81, 587 A.2d 1119 (citation omitted).

Of particular relevance here, the Court rejected the insurer's contention that the decedent put into motion "a chain of events that are the natural and foreseeable consequences of the initial action." *Id.* at 578, 587 A.2d 1119. As the Court observed, "[t]he logical extension" of such an argument "could arguably be applied to the most hazardous or the most inane pursuits." *Id.* at 578, 587 A.2d 1119.

Appellee relies, *inter alia,* on *Gordon v. Metropolitan Life Ins. Co.,* 256 Md. 320, 260 A.2d 338 (1970). There, the insured died as a result of a self-administered heroin overdose, and the decedent's beneficiary sought to recover under a life insurance policy. The policy provided for a double indemnity benefit if the insured's death resulted from "bodily injuries [sustained] solely through violent, external and accidental means." Noting that heroin "carries with it a well known and substantial risk," *id.* at 322, 260 A.2d 338, the Court of Appeals upheld the insurer's refusal to pay double indemnity benefits. In reaching that result, the Court focused on the intentional, illegal act, which involved serious foreseeable risk. *Id.* at 324, 260 A.2d 338. *See also State Farm Mutual Ins. Co. v. Treas,* 254 Md. 615, 620, 255 A.2d 296 (1969) (denying automobile liability coverage to motorist who struck and killed a pedestrian; policy insured bodily injury "caused by accident," but victim's death resulted from intentional act of motorist, and "the possibility of injury to [the victim] could not be said to be unforeseen, unusual, or unexpected"); *Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.,* 248 Md. 148, 150, 235 A.2d 556 (1967) (denying liability coverage to an excavator for injury to property caused by an accident, when excavator deliberately burned piles of wood and rubber tires to clear land, and the smoke and soot from the burning piles caused damage to the homes of neighboring property owners; the damage was not "an event that takes place without one's foresight or expectation," and therefore was not caused by an accident).

Both *Gordon* and *Consumers Life Ins. Co.* are distinguishable from the case *sub judice*. In *Consumer's Life*, the conduct in issue was alcohol consumption, but the decedent did not die from an alcohol overdose. Rather, the decedent was killed as a direct result of a vehicular crash; alcohol was a factor in the crash. Here, the Decedent deliberately put a noose around his neck, and that is ultimately what killed him. In *Gordon*, the illegality of the heroin use was clearly an important aspect of the Court's decision. In contrast, this case involves deviant behavior, but the conduct is not illegal.

## III.

Our task is to determine whether the circuit court was legally correct in concluding that the Insured's death was not the result of an "accident," and that the Insured died from an "intentional self-injury." In the first instance, if the death was not the result of an accident, the Policy is not even triggered, and it would then be unnecessary to evaluate the applicability of any of the exclusions. In the context of this case, however, it is difficult to compartmentalize the analysis of these overlapping and interrelated issues. Therefore, we shall analyze them together.

As we do so, we have come to appreciate the words of the Court in *Gordon, supra*, 256 Md. at 325, 260 A.2d 338: "[C]onfusion ... reigns in this field...." Indeed, the courts are often put in the position of having to "split hairs so finely ..." and "slosh through the bog,"[3] *id.*, focusing on the "precise" language of the contract and the "historical" facts of the

---

**3.** The term "bog" is a shorthand reference to "Serbonian Bog," which was "John 'Milton's name for Lake Sarbonis in Lower Egypt, a marshy tract ... covered with shifting sand.'" *Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1144 n. 2 (2001) (citation omitted). The expression derives from Justice Cardozo's dissent in *Landress v. Phoenix Ins. Co.*, 291 U.S. 491, 54 S.Ct. 461, 78 L.Ed. 934 (1934), an insurance case involving the "metaphysical distinction between 'accidental means' and 'accidental results' that has [long] bedeviled the courts...." *Buce*, 247 F.3d at 1142.

case to determine whether the beneficiaries of a given policy are entitled to recover. *Id.*

In tackling the task that confronts us, we are guided by two cases that the parties have overlooked: *Fister v. Allstate Life Ins. Co.*, 366 Md. 201, 783 A.2d 194 (2001), and *Cole v. State Farm Mut. Ins. Co.*, 359 Md. 298, 753 A.2d 533 (2000). These cases help to focus our analysis, and we turn to consider them.

In *Cole*, the insured was shot and killed as she sat in the passenger seat of her van, while the vehicle was parked in a driveway. The victim's automobile liability policy covered the death of an insured caused by an "accident," but the insurer denied benefits on the ground the death was not the result of an accident. The Court of Appeals disagreed.

The Court referred to the definition of "accident" that was used in *Harleysville, supra,* 248 Md. 148, 235 A.2d 556, which involved an insurance dispute. There, the term "accident" was defined as "a happening; an event that takes place without one's foresight or expectation; an event which proceeds from an unknown cause, or is an unusual effect from a known cause, and therefore not expected." *Id.* at 151, 235 A.2d 556; *see Cole*, 359 Md. at 308, 753 A.2d 533. Although the Court in *Cole* had no quarrel with the definition, as far as it went, the Court was of the view that the *Harleysville* definition was not complete, because it failed to "establish through whose eyes one should analyze whether [an insured's] death was the result of an accident." *Cole*, 359 Md. at 307, 753 A.2d 533. As Judge Harrell observed for the Court, that "distinction" could be "critical" in certain cases. *Id.*

Applying the principles of contract construction outlined above, the Court found the term "accident" ambiguous, noting that it is not susceptible to only one definition. *Id.* at 318, 753 A.2d 533. In concluding that the term is ambiguous, the Court observed that the insurer had previously offered varying definitions in the appellate courts of other states. Given the ambiguity, the Court expressly construed the term against the insurer as the drafter. *Id.*

The Court reviewed several of its earlier insurance cases, each of which generally presented the question of whether particular conduct constituted an "accident" under the policy. It gleaned a common thread: even if " 'an injury is caused by an intentional act [, that] does not preclude it from being caused by an accident if in that act, something unforeseen, unusual and unexpected occurs which produces the event.' " Cole, 359 Md. at 311, 753 A.2d 533 (quoting Harleysville, 248 Md. at 151–52, 235 A.2d 556). Significantly, the Court emphasized that the "test" is "whether the damage caused by the actor's intentional conduct was 'unforeseen, unusual and unexpected,' " and "not whether the actor intended the effects of his or her actions." Cole, 359 Md. at 311, 753 A.2d 533. The Court then concluded that the victim's death resulted from an accident, as that term "should be interpreted" in the policy. Id. at 315, 753 A.2d 533. It reasoned that the shooting was without foresight or expectation, insofar as the victim was concerned. Therefore, from her perspective, it constituted an accident, despite the intentional, non-accidental nature of the conduct from the assailant's perspective. Id.

In reaching its conclusion, the Court adopted a two-part test, utilized in Lincoln Nat'l. Life Ins. Co. v. Evans, 943 F.Supp. 564 (D.Md.1996).[4] There, the federal court considered whether an intentional tort was an accident within the meaning of an accidental death insurance policy. The federal court analyzed the issue from the perspective of the insured. Lincoln Nat'l, 943 F.Supp. at 568.

The test, or "analytical paradigm," has both a subjective and an objective prong. Cole, 359 Md. at 314, 753 A.2d 533. Under the subjective component of the test, the court inquires whether the insured "expected an attack similar to the kind which occurred." Id. at 314, 753 A.2d 533. If the evidence is not sufficient to resolve that question, the court proceeds to the second element, which is objective. With regard to this

---

4. The Maryland federal court, in turn, relied on Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077 (1st Cir.), cert. denied, 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990).

prong, "the court inquires whether a reasonable person with the same knowledge and experience as the insured would have viewed the injury as highly likely to occur in light of the insured's past conduct.... If the answer to the objective question of the test [is] also in the negative, then the insured's death was the result of an 'accident.'" *Id.*

In *Fister,* 366 Md. 201, 783 A.2d 194, the beneficiaries of several life insurance policies sought to recover benefits as a result of the death of the named insured. Coverage was denied based on a suicide exclusion in the policies. As the Court of Appeals recounted, the insured "unquestionably wanted to die, her attempts to kill herself failed, and she ultimately convinced a close friend to pull the trigger of a shotgun aimed at her head." *Id.* at 205, 783 A.2d 194. The Court held that the suicide exclusion was not applicable, and agreed that summary judgment was properly awarded to the beneficiaries. Writing for the Court, Judge Battaglia reasoned that "suicide," a permitted statutory exclusion in § 16–215 of the Insurance Article, "cannot be interpreted to include a death that occurs at the hands of another as the clear and unambiguous definition of the term 'suicide' is to 'intentionally take one's own life.'" *Id.*

Based on our review of *Cole* and *Fister,* we glean several points that are pertinent to this case. First, two key terms—accident and injury—are not defined in the Policy. Applying the general principles of contract construction, we construe these terms by ascribing to them their ordinary meaning, as a lay person would understand them. The meaning of the term "accident" is no clearer here than it was in *Cole.* Indeed, the parties in *Cole* agreed upon the definition of the term, while the parties here do not present us with an agreed upon definition. Nor is the term "injury" susceptible of just one meaning. Therefore, we may use extrinsic sources to aid in our interpretation of the Policy. Second, because the Policy terms are ambiguous, we must construe them against MAMSI as the drafter. We shall also construe the terms from the Insured's perspective.

Third, for the purpose of our analysis, we shall define "accident" with reference to the definition adopted by the *Court* in *Cole*. With respect to the term "injury," we turn to the dictionary. Black's Law Dictionary, Seventh Edition (1999), at 789 defines "bodily injury" as "physical damage to a person's body." It defines "accidental injury" as an "injury resulting from external, violent, and unanticipated causes...." Funk & Wagnalls Encyclopedic College Dictionary (1968), defines "injury" as follows: "n. 1. Harm, damage, or grievous distress inflicted or suffered. 2. A particular instance of such harm; an internal injury. 3. *Law* Any wrong or damage done to another person, his reputation or property...." Webster's II New Riverside University Dictionary (1994), at 629 defines "injury" as "1. Damage of or to a person, property, reputation, or thing. 2. A wound or other specific damage. 3. *Law.* A wrong or damage done to a person or to his or her property, reputation, or rights when caused by the wrongful act of another...."

 Fourth, *Cole* teaches that an event may constitute an accident even when the underlying act that gives rise to the event is intentional. Therefore, we shall adopt and adapt the "analytical paradigm" utilized in *Cole*. As we proceed, we shall consider whether, subjectively, the Insured expected to suffer the fatal injury that occurred as a result of his autoerotic activity. If the evidence is insufficient to resolve that question, we will ponder, objectively, whether a reasonable person, with the same knowledge and experience as the Insured, would have viewed the fatal injury as "highly likely" to occur.

## IV.

We have uncovered numerous cases from other jurisdictions, both federal and state, that have addressed the issue of entitlement to life insurance proceeds when the insured's death is the result of autoerotic asphyxiation. These courts have reached conflicting results. Many of the cases involve suits for recovery of benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et

seq., and apply either a *de novo* or discretionary standard of review, while others arise under state law. Almost all of the cases were decided at the trial court level by way of summary judgment, and many involve policies that contain terms comparable to the provisions in contention here. We shall examine, in detail, the cases discussing both views, in an effort to elucidate the issues presented here.

The most recent decision that we have found arose in an ERISA case, decided by the Ninth Circuit. *See Padfield v. AIG Life Insurance Company*, 290 F.3d 1121, 2002 U.S.App. Lexis 9422 (C.A.9 2002). There, the insurer refused to pay the insurance proceeds under an accidental death policy, which provided for benefits "if [an] injury to the Insured Person results in death within 365 days of the date of the accident that caused the Injury." *Id.* at 1124, 2002 U.S. App. Lexis at *3. The policy also contained two exclusions, one for loss due to suicide and one for "loss caused in whole or in part by, or resulting in whole or in part from . . . intentionally self-inflicted injury." *Id.* at 1130, 2002 U.S. App. Lexis at *23–24. After the trial court granted summary judgment in favor of the insurer, a divided panel of the Ninth Circuit reversed.

In determining if the death or injury was accidental, the court considered whether the occurrence was "unexpected or unintentional." *Id.* at 1126, 2002 U.S. App. Lexis 9422 at *10 (citing 10 Couch on Insurance § 139:16 (3d ed.1995 and 2000 Supp.)). Further, to ascertain whether death or injury was unexpected or unintentional, the court relied upon "an overlapping subjective and objective inquiry." *Id.* The analysis utilized in *Padfield* derived from the First Circuit's decision in *Wickman, supra*, 908 F.2d 1077; it is strikingly similar to the two-part test adopted by the Court in *Cole*, which is also traceable to *Wickman*.

According to the *Padfield* Court, the first part of the inquiry pertains to whether "the insured subjectively lacked an expectation of death or injury." 290 F.3d at 1126, 2002 U.S.App. Lexis 9422, at *10; *see Wickman*, 908 F.2d at 1088. That analysis focuses on the perspective of the insured. 290

F.3d at 1126, 2002 U.S.App. Lexis 9422 at *11. If the insured lacked an expectation of death or injury, the court then considers "whether the suppositions that underlay the insured's expectation were reasonable, *from the perspective of the insured,* allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences." *Id.* (emphasis added). When the subjective expectation of the insured cannot be determined, however, the court considers, instead, "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as *substantially certain* to result from the insured's conduct." *Id.; see Todd,* 47 F.3d at 1456; *Wickman,* 908 F.2d at 1088–89.

As in this case, the record in *Padfield* was "limited." *Padfield,* 290 F.3d at 1127, 2002 U.S. App. Lexis 9422, at *12. Nevertheless, several key determinations undergirded the court's conclusion that death was not expected and was the result of an accident. Focusing, for our purposes, on the objective prong, we note that the court pointed out that death by autoerotic asphyxiation is "statistically rare." *Id.* at 1127, 2002 U.S. App. Lexis 9422 at *13. Thus, those who engage in autoerotic asphyxiation reasonably "expect to survive the experience...." *Id.* at 1127, 2002 U.S. App. Lexis 9422, at *12. Significantly, the court recognized that death is not a "substantially certain" result of the practice. *Id.* at 1127, 2002 U.S. App. Lexis 9422, at *13. To the contrary, autoerotic asphyxiation is " 'a repetitive pattern of behavior that individuals engage in over a period of years.' " *Padfield,* 290 F.3d at 1126, 2002 U.S.App. Lexis 9422, at *9 (quoting *Parker v. Danaher Corp.,* 851 F.Supp. 1287, 1290 (W.D.Ark.1994)). Moreover, "[w]hen performed successfully, the act results only in a temporary decrease in oxygen levels that cause lightheadedness...." *Padfield,* 290 F.3d at 1126, 2002 U.S.App. Lexis 9422, at *9; *see American Bankers Ins. Co. of Florida v. Gilberts,* 181 F.3d 931 (8th Cir.1999).

Concluding that the Insured's "expectation of survival ... was reasonable," both subjectively and objectively, *Padfield,* at 1127, 2002 U.S. App. Lexis 9422, at *13, the court readily

determined that the Insured's death was accidental. Relying on the "uniform medical and behavioral science evidence indicating that autoerotic activity ordinarily has a nonfatal outcome," *id.*, the court reasoned that the incidence of death from the activity " 'falls far short of what would be required to negate coverage' under an accidental death policy." *Id.* (quoting *Todd*, 47 F.3d at 1456); *see Bennett v. American Int'l. Life Assurance Co. of N.Y.*, 956 F.Supp. 201, 211–12 (N.D.N.Y. 1997).

The court also concluded that the Insured's death was not the result of an intentional, self-inflicted injury. *Padfield*, 290 F.3d at 1130, 2002 U.S.App. Lexis 9422, at *22. In this regard, the court considered whether the intended physical consequences of the act amounted to an "injury" under the policy. It reasoned that, "[i]f they were injuries, and if they led to [the insured's] death, the exclusion applies." *Id.* at 1129, 2002 U.S.App. Lexis 9422 at *18. Significantly, the court said that "if the events ... had gone as [the insured] intended, he would have experienced a temporary deprivation of oxygen, a euphoric light-headedness ... and an intensified sexual experience." *Id.* at 1129, 2002 U.S.App. Lexis 9422 at *19. Thereafter, his oxygen level would have "been restored, his euphoric state would have subsided, and he would have returned home uninjured." *Id.* According to the court, the intended consequences would not have amounted to an "injury" as that term is popularly understood. *Id.* Because events went awry, however, "the intended physical consequences led to unintended injuries." *Id.*

The court concluded that the fatal injuries were not intentionally self-inflicted within the meaning of the policy. *Id.* at 1130, 2002 U.S.App. Lexis 9422 at *22. In this regard, the court noted that the insured had no subjective intent to cause the fatal injuries, and his "suppositions" were objectively reasonable, *id.* at 1129, 2002 U.S.App. Lexis 9422 at *20, because a reasonable person with a similar background "would not have viewed the strangulation injury that resulted in his death as 'substantially certain' to result from his conduct." *Id.* Although the decedent certainly engaged in "risky" behav-

ior, *id.*, the court regarded it as conduct that amounted to a "fatal mistake," *id.* at 1130, 2002 U.S.App. Lexis 9422 at *22, not an intentional, self-inflicted injury.

*Critchlow v. First UNUM Life Ins. Co. of America*, 198 F.Supp.2d 318, 2002 U.S. Dist. Lexis 6600 (W.D.N.Y.2002), reaches a contrary result. There, the decedent had utilized an elaborate system of escape mechanisms, consisting of ropes and counterweights, but the system failed and the insured died. The insurer denied benefits on the ground that the death was not due to an accident, but was instead the result of intentional, self-inflicted injury. Applying a *de novo* standard of review to the ERISA-based claim, the federal court agreed.

A primary aspect of the court's decision concerned its assessment of the act of partial strangulation, which is involved in a successful autoerotic asphyxiation experience. The court was of the view that "[p]artial strangulation is an injury in and of itself." *Id.* at 323, 2002 U.S. Dist. Lexis 6600 at *11. It reasoned that the insured intentionally constricted his windpipe, so as to reduce the flow of oxygen to his brain, and it was that action that led directly to death by asphyxiation. *Id.* at 324, 2002 U.S. Dist. Lexis 6600 at *12. The court stated, *id.* at 323, 2002 U.S. Dist. Lexis 6600 at *10:

> That it is possible to [cut off oxygen] for a short period without causing lasting injury, or that injury or death does not immediately occur upon constriction of the trachea, does not mean that decedent's intentional act caused him no injury. Decedent may have thought that he could free himself before he lost consciousness, but he was wrong. His death was nevertheless intentionally self-inflicted, given the serious and obvious risk of death entailed by decedent's intentional actions.

The court concluded that the decedent "intended to perform an injurious act—strangling himself, albeit not to the point of death—but another unintended injury resulted: his death." *Id.* at 324, 2002 U.S. Dist. Lexis 6600 at *12. Moreover, it flatly rejected the plaintiff's argument that the injuries were not intentionally self-inflicted, stating that the beneficiary's

position "strains logic . . . ." *Id.* at 323, 2002 U.S. Dist. Lexis 6600 at *10.

*Cronin v. Zurich American Insurance Company,* 189 F.Supp.2d 29 (S.D.N.Y.2002), is consistent with *Critchlow.* There, the wife of the decedent sought to recover under two accidental death insurance policies issued through her husband's employment. The insurers claimed that death from autoerotic asphyxiation was not "accidental," and recovery was barred based on the exclusion for an intentional, self-inflicted injury. Although the insurers acknowledged that the insured may not have intended to kill himself, they claimed that he engaged in sexual self-gratification "at the risk of death." *Id.* at 37.

The court concluded that death from self-strangulation is not accidental. *Id.* at 37. Recognizing that the decedent "may not intend his death," *id.,* the court nonetheless noted that he "clearly wishes to put himself in a position that risks death's irreversible grasp." *Id.* The court reasoned:

Restricting one's bloodflow to the brain with a strap in order to reduce conscious awareness and heighten [sexual] sensation . . . creates an imminent danger that consciousness will be lost and death will result. One who purposefully creates the conditions of risk foresees the logical consequence of risk, and has to assume that he may not be able to manage those conditions so as to eliminate the risk he has created. *An occurrence is not accidental if it results from a foreseen risk purposefully brought about.*

*Id.* (emphasis added).

Moreover, the court found that the injury was purposefully self-inflicted. As in *Critchlow,* the court's perception of what constitutes an injury was an important factor in its decision. Fundamentally, the court regarded partial strangulation as an injury, whether or not it was of a permanent nature.

The court recognized that, according to the experts, most of the people who practice the activity retain their senses, and are usually able to act in time "to prevent permanent damage to the tissues of the neck or brain, and the body can recuper-

ate." Id. It also acknowledged that, ordinarily, there is no "lasting harm or death," and those who engage in the practice "do not expect death to result." Id. Nevertheless, the court focused on the "abnormal" effect on the brain from such conduct, in which "the higher cerebral functions of thought, consciousness and awareness are compromised; and a dangerous loss of coordination results." Id. at 38. It said: "Temporary cell damage results, and reduced brain activity occurs.... This loss of awareness and control in the search for an ever more intense high risks death, and limits the conscious ability to reverse death's grasp." Id. Further, the court observed that hypoxia and hypercapnia induce "lightheadedness, loss of coordination, and the inability to appreciate the hazard...." Id.

In that court's view, when a "policyholder [intentionally] causes a wrong to the integrity of his own body," such conduct amounts to a purposefully self-inflicted injury, id. at 39, even if the insured did not intend to cause permanent injury. The court reasoned that the insured intended "to restrict the flow of blood and oxygen to his brain in order to impair his mental processes." Id. at 40. Therefore, from the court's perspective, it made no difference whether the insured caused an injury to his body "in the search for delight" or "in the search for pain," because both "expose the practitioner to a substantially increased risk of accidental death." Id. Moreover, even if the insured intended to reverse the harm by "timely intervention," the court noted that his ability to do so was clearly compromised. Id.

Construing Virginia law, the Fourth Circuit has twice held that death caused by autoerotic asphyxiation is not an accident within the meaning of the life insurance policies at issue and Virginia law. See International Underwriters, Inc. v. Home Ins. Co., 662 F.2d 1084 (4th Cir.1981); Runge v. Metropolitan Life Ins. Co., 537 F.2d 1157 (4th Cir.1976). In International Underwriters, the policy provided for payment for death from injury, defined as "accidental bodily injury sustained by a covered person ... which results directly and independently of all other causes in a loss...." Id. at 1085. The policy also

excluded coverage for any loss "caused by, contributed to or resulting from: 1) intentionally self-inflicted injuries. . . ." *Id.* The insurer refused to pay death benefits to the decedent's beneficiaries, claiming that death from autoerotic hanging was not the result of an accident and was self-inflicted. The Fourth Circuit agreed.

The court explained that the decedent used a noose "with the intention of restricting the air flow to the point of asphyxia, loss of consciousness," *id.* at 1086, although he did not intend for "the contraption" to cause death. *Id.* The court believed the insured knew "the risk of death or serious bodily injury naturally resulting from voluntarily induced unconsciousness with a noose around the neck, restricting blood and air flow." *Id.* It said:

> Because the decedent voluntarily placed his neck in the noose and tightened the same to the point where he lost consciousness, we think his death was the natural result of a voluntary act unaccompanied by anything unforeseen except death or injury. He is bound to have foreseen that death or serious bodily injury could have resulted when he voluntarily induced his unconsciousness with a noose around his neck.

*Id.* at 1087 (citation omitted). Moreover, the Fourth Circuit agreed with the insurer that the death was not transformed to an accident merely because the release mechanism malfunctioned. *Id.*

Similarly, in *Sigler v. Mutual Benefit Life Ins. Co.*, 506 F.Supp. 542 (S.D.Iowa), *aff'd.*, 663 F.2d 49 (8th Cir.1981) (per curiam), the court, applying Iowa law, held that the insured's death from autoerotic asphyxiation was not the result of an accident, *id.* at 545, because "a reasonable person would comprehend and foresee that placing a noose around his neck and subsequently hanging himself with the noose for the purpose of inducing asphyxia could result in his death." *Id.* at 544. Although the insured "did not intend to cause his own death," *id.*, "he reasonably should have expected that his actions could be fatal." *Id.* Alternatively, the court concluded

that death was due to an intentional self-inflicted injury. It reasoned, at 506 F.Supp. at 545:

Although [the insured] did not intend to produce the unconsciousness that resulted in his death, his voluntary acts were intended to temporarily restrict his air supply to heighten the sensations of masturbation. Therefore, the elements of "intentionally, self-inflicted" are satisfied. The only question remaining is whether self-inflicted hanging is an "injury of any kind." The Court believes that it is. If someone else had placed [the insured] in the same position as he placed himself to temporarily restrict his ability to breathe, it would have been an injury. In the Court's opinion, it continues to be an injury even when it is self-inflicted.

For other cases decided under state law, see, e.g., *American Bankers Ins. Co. of Florida v. Gilberts*, 181 F.3d 931, 933 (8th Cir.1999) (applying Minnesota law and concluding that partial strangulation is not an injury as a matter of law; "a temporary decrease in the oxygen level of the brain" is not a bodily injury "in the ordinary sense of the term"); *Sims v. Monumental Gen. Ins. Co.*, 960 F.2d 478, 480 (5th Cir.1992) (applying Louisiana law and concluding that "partial strangulation" during autoerotic asphyxiation is an injury; recovery barred under exclusion for intentional self-inflicted injury; issue of accidental death not reached); *Kennedy v. Washington Nat'l. Ins. Co.*, 136 Wis.2d 425, 401 N.W.2d 842 (Ct.App.1987) (affirming award of summary judgment to plaintiff on ground that death by autoerotic asphyxiation was accidental; stating that although autoerotic activity is risky, death is not an expected result); *Conn. Gen. Life Ins. Co. v. Tommie*, 619 S.W.2d 199, 203 (Tex. Civ.App.1981) (applying Texas law and upholding jury verdict which found death from autoerotic activity accidental).

For cases arising under ERISA, see, e.g., *Hamilton v. AIG Life Ins. Co.*, 182 F.Supp.2d 39, 49–50 (D.D.C.2002) (finding no abuse of discretion in determination that partial strangulation is an injury); *Fawcett v. Metropolitan Life Ins. Co.*, 2000 WL 979994, 2000 U.S. Dist. Lexis 10061 (S.D. Ohio June 28, 2000) (concluding that death from autoerotic asphyxiation was unin-

tended and thus accidental under insurance policy, but barring recovery based on exclusion for intentional, self-inflicted injury; although decedent enjoyed the activity, and did not intend to die, his actions in achieving his enjoyment amounted to self-inflicted injury); *Bennett v. American Life Assurance Co. of N.Y.*, 956 F.Supp. 201, 212 (N.D.N.Y.1997) (denying cross motions for summary judgment because of disputes of material fact as to whether insured's "subjective expectation of survival was objectively reasonably"; even if insured intended to lose consciousness, "this condition is not an injury that invariably leads to death"; policy did not contain self-inflicted injury exclusion); *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1456 (5th Cir.1995) (affirming trial court's conclusion that death by autoerotic asphyxiation was accidental; no self-inflicted injury exclusion in policy); *Parker v. Danaher Corp.*, 851 F.Supp. 1287, 1295 (W.D.Ark.1994) (concluding that autoerotic death was accidental under federal common law; no exclusion in policy for self-inflicted injury).

## V.

After considerable jurisprudential wandering, we have approached the point of resolution. Strong arguments support the view of each side. We believe, however, that the view of the Ninth Circuit expresses the better approach. Therefore, we conclude that the Insured's death was the result of an accident and was not the result of an intentional self-injury. We explain.

With respect to the issue of whether the death was the result of an accident, we reiterate that the Policy does not define "accident." As in *Cole*, 359 Md. 298, 753 A.2d 533, "accident" is a term susceptible of more than one meaning. Because the term is ambiguous, it must be construed against the Insurer as the drafter.

*Cole* defined "accident" as "an event that takes place without one's foresight or expectation ... or an unusual effect from a known cause, and therefore not expected." *Id.* at 308, 753 A.2d 533. Guided by *Cole*, and mindful of the differences

in the cases, we also believe that the definition should be considered from the Insured's perspective. As the Court indicated in *Cole*, even if the Insured's underlying conduct was intentional, this does not necessarily compel the conclusion that the death was non-accidental.

In analyzing whether the Insured's death was an accident, we believe it is appropriate to apply the rationale of the two-part test adopted by the Court in *Cole*, which is similar to the analysis used by the Ninth Circuit in *Padfield*. The evidence here is not sufficient to resolve the first prong, or subjective component, of the test; the evidence does not reveal whether the Insured subjectively lacked an expectation of death or injury, or whether his subjective beliefs were reasonably held. On the other hand, the analysis of the objective prong leaves no doubt as to the matter of expectancy. This prong asks, in effect, "whether a reasonable person with the same knowledge and experience as the insured would have viewed the injury as highly likely to occur...." *Cole*, 359 Md. at 314, 753 A.2d 533. For the reasons articulated by the Court in *Padfield*, we are amply satisfied that the Insured would not have considered the fatal injury highly likely to occur.

To be sure, death occasionally occurs from autoerotic conduct. But, it is not a statistically frequent occurrence. To the contrary, the medical literature points to the infrequency of fatalities, and emphasizes the accidental nature of the deaths that occur. Moreover, virtually all the courts that have considered these cases, including those that have found for the insurers, recognize that most people survive such conduct. They engage in the behavior to derive sexual pleasure, which requires their survival. Accordingly, we conclude that it was objectively reasonable for the Insured to believe that a fatality was not highly likely. It follows that the death constituted an accident within the meaning of the Policy.

We next address the issue of intentional self-injury. The parties agree that the Insured did not intend to die, but they disagree about whether the Insured intended to injure himself. The term "injury," as we have said, is undefined in

the Policy, and we have previously set forth several dictionary definitions. These show that the term "injury" is susceptible of many meanings.

■ Appellee observes that the Insured intended to asphyxiate himself, and contends that even partial, brief asphyxia is an "injury" under the Policy. The principles of contract construction require us to give the term "injury" its ordinary meaning, as a layperson would understand it, and to construe the term against the Insurer, because of the ambiguity. In our view, the term "injury" would commonly be understood by a layperson to mean physical damage or harm to the body, whether permanent or temporary.

As we observed earlier, the parties did not submit expert evidence to show, medically, whether a successful autoerotic experience, involving partial asphyxia for a brief duration, causes any physiological "injury," i.e., harm or damage, to the brain or body. From the information presented, however, it is clear that the goal of the practice is sexual gratification, not injury. Had the Insured achieved his goal, he would not have suffered an injury as that term is popularly understood. If the activity had not gone awry, the Decedent would have experienced a temporary loss of oxygen to the brain that is associated with a heightened sexual experience. The fleeting hypoxia that is intended and achieved with a successful autoerotic experience does not, in our view, constitute an injury with the meaning of the Policy, as that term is commonly used. Those who survive the experience generally show no signs of physical injury or harm; no telltale sign brands someone as the survivor of an autoerotic experience.

Common knowledge supports our conclusion. It is generally believed that one can safely go without oxygen for a brief period of time, without sustaining what is perceived as an injury. A swimmer often holds his or her breath while under water, without sustaining injury. A similarly brief deprivation of oxygen is what was contemplated by the Insured. As horrifying as it may seem to constrict the neck in the way that is generally done during autoerotic hanging, the risky or

foolish nature of the behavior does not make it an injury. Therefore, we reject appellee's position that the partial strangulation associated with a successful autoerotic experience is, in and of itself, an injury within the meaning of the Policy.

There are, to be sure, countless activities that are inherently dangerous, albeit more socially acceptable, than autoerotic asphyxiation. Skydiving, bungee jumping, white water rafting, parasailing, mountain climbing, and scuba diving are among the activities that come to mind. Several imperfect analogies may be helpful in our analysis.

When a sky diver jumps from an airplane, he or she is unlikely to survive if the parachute malfunctions. Arguably, the parachute is akin to the escape mechanism utilized by the Insured during autoerotic hanging. A skydiver's voluntary and knowing participation in an activity as risky as skydiving would not necessarily preclude a finding of death by accident, in the event that the risk of parachute failure materializes. Nor would the resulting fatal injury necessarily be regarded as intentionally self-inflicted, merely because the skydiver deliberately jumped from the plane and the parachute failed to operate. The same rationale applies here; the offensive or foolish nature of the conduct does not determine the result.

Similarly, if a person intentionally stands at the edge of a cliff and then falls off, he surely would have suffered an accident, however perilous or foolish it may have been to walk so close to the edge. Nor can it be said that, merely by walking close to the edge, and flirting with danger, the individual intentionally jumped.

In sum, we conclude that the injuries sustained by the Decedent were the result of an accident, and were not intentionally self-inflicted. The noose and plastic bag were not used with the intent to cause injury, and the Insured reasonably did not foresee or expect such injuries. Therefore, the circuit court erred in granting the Insurer's motion for summary judgment, and in denying appellants' motion for summary judgment.

JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.